Todd M. Touton, Esq., #1744
Jennifer L. Braster, Esq., #9982
LIONEL SAWYER & COLLINS
300 South Fourth St., Suite 1700
Las Vegas, NV 89101
Telephone: (702) 383-8888
Fax: (702) 383-8845
E-mail: ttouton@lionelsawyer.com

Attorneys for Plaintiff, Del Webb Communities, Inc.

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| DEL WEBB COMMUNITIES, INC. | Case No. 2:08-cv-00571-RCJ-GWF |
| Plaintiff, | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| CHARLES LESLIE PARTINGTON d/b/a M.C. MOJAVE CONSTRUCTION, JOHN WILSON, individually, and DOE INDIVIDUALS I-X, inclusive; and ROE ENTITIES I-X, inclusive, | |
| Defendants. | |

Pursuant to Fed.R.Civ.P. 56 and 65(a)(2), plaintiff Del Webb Communities, Inc. ("Del Webb") seeks a partial summary judgment determining that as a matter of law:

(1) defendants Charles Partington ("Partington") d/b/a/ M. C. Mojave Construction ("MCMC"), and John Wilson ("Wilson"), individually and through their agents, solicited, performed or supervised residential inspections, and prepared or supervised the preparation and communication of inspection reports for homeowners in Del Webb Southern Nevada projects, including the Sun City Anthem age-restricted community, misrepresenting to homeowners defendants' legal authority to perform those inspections and to prepare and communicate inspection reports, the existence of a relationship with Del Webb, the cost to the homeowners of the inspections, and other matters, as will be explained further *infra*, all contrary to Nevada law and in violation of this Court's October 8, 2008, Findings of Fact, Conclusions of Law and Preliminary Injunction Order (the "PIO," Doc. 34);

(2) defendants are liable for violating the Lanham Act, 15 U.S.C. § 1125(a)(1);

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1

(3)     defendants are liable under NRS 41.600(2) and (3) for violating the Nevada Deceptive

2

Trade Practices Act, NRS 598.0915(1), (2), (3), and (4), and NRS 598.0923(1);

3

(4)     defendants are liable for champerty and maintenance; and

4

(5)     defendants and their agents should be permanently enjoined from conducting

5

inspections and making and communicating inspection reports in any Nevada Del Webb community.

6

No genuine issues of material fact exist as to these issues and Del Webb is entitled to partial

7

summary judgment as to them as a matter of law.  This motion is based on all papers on file, the

8

Court's PIO,[1] the following points and authorities, exhibits, and Affidavit of Lynda Mabry, Esq.

9

10

LIONEL SAWYER & COLLINS

11

By

12

Todd M. Touton, Esq.
1700 Bank of America Plaza
300 South Fourth St.
Las Vegas, NV 89101

13

14

Attorneys for Plaintiff, Del Webb Communities, Inc.

15

16

**MEMORANDUM OF POINTS AND AUTHORITIES**

17

I.    **Uncontested Facts**

18

A.    **Del Webb and Sun City Anthem**

19

In 1998, Del Webb opened Sun City Anthem, an age-restricted community designed for

20

over 7,000 homes and now nearly sold out.  In addition to Sun City Anthem, Del Webb has five

21

other age-restricted communities open in Clark County and also offers homes in non-age-restricted

22

communities in Nevada.  PIO (Doc. 34), ¶¶ 3-4.

23

24

Beginning in 2001, at Sun City Anthem and its other Nevada communities, Del Webb

25

offered residents various warranties, including up to ten-years coverage for certain structural

26

27

---

[1]     Under Fed.R.Civ.P. 65(a)(2), even when a preliminary injunction motion is not consolidated with trial on the merits (as here), "evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

elements.[2]  PIO, ¶¶11-12.  The 2001 Del Webb Home Protection Plan also provides for alternative

dispute resolution in the event of a dispute with a homeowner.  PIO, ¶13.

### B.    Defendants Partington and Wilson, Their Agents, and Business Entities

Partington, who has a limited Nevada B-2 contractor's license (for residential and small

commercial construction[3]) operated MCMC in Clark County (as a sole proprietorship until March

27, 2008, and then as an LLC).[4]  Partington Depo., Ex. 1, p. 10, l. 10 - p. 11, l. 8.  Neither Partington

nor anyone else associated with him or his entities is licensed by the Nevada Real Estate Division

under NRS Chapter 645D, a prerequisite to inspecting residences and to preparing and

communicating inspection reports.  Id., p. 13, ll. 2-10.  Partington continues to allow Wilson to use

his inapplicable B-2 license to conduct residential inspections.  Id., p. 146, ll. 21-25.

Wilson, who does not have and has never had either a Nevada contractor's or an inspector's

license, was and is associated with Partington, MCMC, and other entities through which he

conducted and, despite the PIO, continues to conduct an unlicensed inspection business.[5]  Wilson's

first association in Nevada was with Raising the Standard of Living ("RSL") to institute a union-

sponsored inspection program and to get homeowners "lined up with legal teams...."  Wilson Depo.,

Ex. 3, at p. 33, l. 19 - p. 34, l. 23.  Then, beginning in 2005 to 2006, Wilson was associated with

Construction Design Specialists ("CDS"),[6] for which he supervised residential inspections.  Id., p.

---

[2]      Although the 2001 warranties were not part of prior sales packages, Del Webb in fact treated earlier purchasers as if they had the benefits of 10-year warranties.  PIO, ¶ 14.

[3]      NAC 624.l170(2) limits B-2 licensees to "[t]he construction and remodeling of houses and other structures" of not more than 3 stories above ground or 1 story below.

[4]      Partington illegally operated the sole proprietorship by relying on an expired fictitious name certificate.  PIO, ¶5.

[5]      Wilson does not even operate the inspection division from a commercial office, but from a mail drop.  Partington Depo., Ex. 1, p. 24, ll. 1-19; p. 150, ll. 12-19.

[6]      CDS is a Nevada corporation and Partington is its licensee for construction work. Wilson Depo., Ex. 3, p. 19, ll. 6-10; Partington Depo., Ex. 1, p. 15, ll. 5-10.  When CDS' owners split up, Wilson wanted to buy it, but said he had to "either get a license or find a licensed contractor."  Ex. 3, p. 42, ll. 4-8.  Partington formed MCMC and allowed Wilson to conduct his

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

3

21, ll. 5-12.  Wilson admits he continued defendants' inspection business in Sun City Anthem after

entry of the October 8, 2008, PIO.  See Exs. 5 and 6 (October 22 and December 15, 2008, inspection

reports made by Wilson or his employees for Sun City Anthem homeowners); Diaz Depo., Ex. 2, p.

64, l. 11-15 (one of defendants' inspectors testified he performed the inspection for the October 22,

2008, report); Wilson Depo., Ex. 3, p. 339, l. 21 - p. 340, l. 23 (inspections continued in Sun City

Anthem after the October 22 and December 15, 2008, reports).[7]

Wilson still operates his inspection business through a continued association with Partington

and a new association with Richard G. Franklin & Associates ("Franklin").[8]  Like Partington,

Franklin has a B-2 general contractor's license, but no Chapter 645D license.  Wilson Depo., Ex. 3,

p. 222, l. 25 - p. 223, l. 1.  In defiance of the October 8, 2008, PIO (¶¶ 39 and 44), Wilson argues his

associations with licensed general contractors, such as Partington and Franklin, suffice to support

his inspection business.[9]  Wilson even asserts he needs no license whatsoever to conduct the

inspections and make the reports defendants use to foment Chapter 40 claims.[10]  Regardless of these

---

inspection division under both the CDS or MCMC names.  Id., p. 42, l. 23 - p. 43, l. 1.

[7]   Despite the PIO, Wilson's lawyers told him he could continue his work in Sun City
Anthem by acting as their expert.  Wilson Depo., Ex. 3, p. 341, l. 10 - p. 343, l. 11 ("'Mr. Pollock
… felt that… the court order… was only for work that I would generate, not for working for him as
an expert.  That if he hired me as an expert, I can go and do the work") and ("I got indication from
Angius & Terry that continuing on the projects that they already had and I was their expert").

[8]   Wilson says he moved to Franklin where he continues his inspection business,
including within Sun City Anthem.  Wilson Depo., Ex. 3, p. 226, ll. 4-16; p. 227, ll. 18-19; Farruggia
(Wilson employee who prepared reports) Depo., Ex. 4,  p. 21, ll. 10-11 (as of 12/18/08, Farruggia
was working for Wilson at Franklin).

[9]   Wilson is probably personally ineligible for any privileged license in Nevada -- he
pled nolo contendere to criminal charges of workers' compensation insurance fraud associated with
a business for which he held a roofing license in California in 1996.  Wilson Depo., Ex. 3, p. 236, ll.
15-23; Felony Complaint, Plea and Sentence, Ex. 39  Under NRS 645D.170, Wilson would have to
disclose his conviction in an application for an inspector's license because it is not only a felony,
but also a crime of "moral turpitude."  Wilson concedes he never applied for any privileged license
in Nevada.  Exhibit 3, p. 237, ll. 3-5.

[10]   Wilson testified he could set up an inspection division at any B-2 licensed company,
but also that "*you don't even need a B2 license*."  12/1/08 Wilson Depo., Ex. 3, p. 159, ll. 2-7
(emphasis added).  According to him, the B2 license is only needed to do intrusive testing, i.e., if
you "have to move and dig into different parts of the house…."  Id., p. 159, ll. 14-24.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

4

beliefs, however, Wilson holds himself out to the public, including Sun City Anthem homeowners, as if he were properly licensed in Nevada to inspect and to make and communicate inspection reports. See Ex. 7; and Exs. 19-21. Without any license whatsoever, Wilson walks door-to-door in an age-restricted community, soliciting inspections from unsuspecting homeowners, carrying attorney retainer letters for homeowners' signatures. He characterizes his cold calls as going "door to door to inform homeowners what might be wrong with the[ir] home." Wilson E-Mail, Ex. 45.

Defendants' documents prove the illegality of their conduct. Although Wilson's MCMC "inspection division" was already operating, in mid-2007 he prepared and then he and Partington entered into a written "Management Agreement" governing their inspection business. Management Agreement, Ex. 8; Partington Depo., Ex. 1, p. 127, ll. 8-24. That agreement terms Wilson's business the "Chapter 40 Claims Division" and calls for a split of its profits 75% to Wilson and 25% to Partington. Ex. 8; Wilson Depo., Ex. 3, p. 202, ll. 21-23.

By the Management Agreement, Wilson agreed to: (1) coordinate and oversee inspections; (2) review initial inspection reports with homeowners; (3) explain to homeowners the steps for filing Chapter 40 complaints; (4) explain to homeowners how MCMC can assist them with the Chapter 40 process; and (5) explain to homeowners how certain attorneys can enhance their Chapter 40 success.[11] Ex. 8. If a homeowner signed with one of the law firms promoted by the "Chapter 40 Claims Division" (chiefly Angius & Terry and Charles Pollock), Wilson agreed to: (1) confirm the homeowners' contact with the attorneys; (2) review the initial inspection report with the attorneys;

---

[11]    Defendants' rendering of legal advice constitutes the unauthorized practice of law. In re Discipline of Lerner, __ Nev. __, 197 P.3d 1067, 1069 (2008) ("the practice of law is involved when the activity requires the exercise of judgment in applying general legal knowledge to a client's specific problem"). The ban on the unauthorized practice of law protects the public by requiring "that in the securing of professional advice and assistance upon matters affecting one's legal rights one must have assurance of competence and integrity and must enjoy freedom of full disclosure with complete confidence in the undivided allegiance of one's counselor in the definition and assertion of the rights in question." Id., quoting Pioneer Title v. State Bar, 74 Nev. 186, 189-90, 326 P.2d 408, 410 (1958).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

5

(3) monitor production of the report; (4) attend on-site evaluations; (5) assist lawyers in maintaining

contact with homeowners; (6) review the builder's response and repairs with the law firm and

homeowner; and (7) attend mediations. Id. For his part, Partington agreed to (1) provide billing and

bookkeeping services "for Chapter 40 Claims division;" (2) provide adequate insurance; (3)

"maintain licensing required by law to perform inspections;" (4) compensate outside inspectors for

work for the "Chapter 40 Claims division;" (5) provide supplies "to perform inspections and publish

reports for Chapter 40 Claims division;" (6) review all reports; (7) attend mediations; and (8) change

MCMC to a subchapter S corporation. Id.

   While Partington testified he oversaw no inspections, reviewed no reports, supervised no

inspectors, attended only one mediation to see what it was like, and created no subchapter S

corporation, but did advance the salaries of the "Chapter 40 Claims Division" employees, including

Wilson, in anticipation of a $1+ million pay-day when the hundreds of Chapter 40 actions initiated

by Wilson's illegal inspections were concluded and the law firms defendants promoted paid over

monies collected via the claims.[12] See Ex. 9, MCMC Receivables (Depo. Ex. 27); Wilson Depo.,

Ex. 3, p. 163, ll. 1-3 ("Partington wasn't actively engaged in a day-to-day process of any of the

evaluations that we were doing…."); Partington Depo., Ex. 1, p. 17, ll. 16-21; p. 18, ll. 4-14

(Partington did no inspections); p. 130, ll. 8-19 ("I gave [Wilson] free head to do it…. You can't tell

John Wilson anything"); p. 131, l. 24 - p. 132, l. 10 (Partington attended one mediation); p. 133, l. 20

- p. 134, l. 2 (no outside inspectors were ever used).

_____

[12]      Defendants' records show they inspected hundreds of Sun City Anthem homes for
which they claim nearly $1 million from associated law firms. PIO, ¶32. Wilson was responsible
for around 1,200 inspections and anticipates a profit of $900 to $1,000 per inspection. Wilson
Depo., Ex. 3, p. 36, l. 25 - p. 37, l. 1; p. 52, ll. 2-4. Defendants paid their unlicensed inspectors $25
to develop an order; $50 to get a homeowner to sign an agreement to have MCMC supervise
Chapter 40 proceedings; and $75 for a homeowner to sign a retainer letter with either Angius &
Terry or Charles Pollock. Diaz Depo., Ex. 2, p. 19, l. 8 - p. 20, l. 120. The unlicensed inspectors
took both Angius & Terry and Pollock retainer letters to initial meetings with homeowners and
frequently obtained signed retainer letters before *any* inspection even occurred. Id. at 128, ll. 7-13;
9/18/07 Furjanics retainer, Ex. 40; Farruggia 9/28/07 timesheet, Ex. 41.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Partington consented to Wilson's operation of the illegal inspection business. Wilson's Answers to First Set of Interrogatories, Ex. 10, Answer No. 4 ("My position or title with CDS and MC Mojave was to manage the Evaluation Division. I had no supervisors"); Partington Depo., Ex. 1, p. 22, l. 4 - p. 23, l. 25; p. 26, ll. 17-19; p. 27, ll. 19 - p. 33, l. 1; p. 41, ll. 7-11 (Wilson hired and fired inspectors, oversaw the inspections division, and kept its separate books and records); id., p. 55, ll. 4-9 (Partington had no idea who prepared what reports for which homeowners); Diaz Depo., Ex. 2, p. 42, ll. 6-14; p. 58, ll. 10-12 (Diaz's only training was from Wilson); and Ex. 11, Wilson's 11/24/08 Answer No. 4 to Del Webb's Second Set of Interrogatories (the only "training" MCMC provided to unlicensed inspectors was by other unlicensed personnel). One of the unlicensed "inspectors," Vince Farruggia, testified that his training consisted of working for three weeks with another unlicensed "inspector" who "point[ed] out *what they wanted pointed out*, what they typically point out on a home." Farruggia Depo., Ex. 4, p. 13, ll. 5-8 (emphasis added).

Although as of August 11, 2008, Wilson and Partington documented the end of their relationship, they in fact continued working together. 8/8/08 Separation Agreement, Ex. 27 (Depo. Ex. 29).[13] Wilson believed he continued his illegal inspection business under Partington's license and with Partington's consent. Partington Depo., Ex. 1, p. 256, ll. 1-9 (as of his 11/18/08 deposition, Partington still consented to Wilson's use of his contractor's license); Diaz Depo., Ex. 2, p. 70, ll. 14-22 (Diaz performed inspections for Wilson at MCMC and Franklin at the same time).

**C.    Defendants' Solicitations and Services Are Based on Material Misrepresentations Intended to Foment Chapter 40 Claims**

Defendants solicited inspections and fomented Chapter 40 claims by door-to-door canvassing, a website, the distribution of hundreds of fliers or placards throughout Sun City

---

[13]    That agreement (Ex. 27) also provided that of approximately $45,000 expected to be collected on invoices for inspections performed for attorney Pollock in the "Anthem Project," the first $35,350 would go to Partington. Wilson Depo., Ex. 3, p. 107, l. 9 - p. 108, l. 4. Then, $6,500 was earmarked to pay Wilson's wages, with anything else collected to be split 75/25%.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Anthem, and the delivery of inspection reports and other form documents all misrepresenting defendants' authority to inspect and make inspection reports under Nevada law, the cost of their services to the homeowners, the existence of a relationship with Del Webb, and the effect of the documents they pressured homeowners to sign.

### 1.    Face-to-Face Solicitations

Defendants misled homeowners into believing they were licensed under Nevada law to inspect residences and make inspection reports. Esposito Depo., Ex. 12, p. 29, ll. 3-5 (led to believe defendants were licensed); Cole Depo., Ex. 13, p. 37, ll. 20-23 (relied on representations defendants had a general contractor's license supporting their inspection services); Mary McCullough Depo., Ex. 14 p. 28, ll. 8-10 (defendants represented they were licensed to inspect); Kalish Depo., Ex. 15, p. 29, ll. 16-18 (defendants represented their time in the business and background leading the homeowner to feel "very comfortable with them"); and Marilyn Hendrickson Depo., Ex. 16, p. 35, ll. 10-25 (relied on the representation of a license based on "a big book that had all kinds of stuff in there"). Homeowners also testified they would not have consented to the inspections had they known defendants were not in fact licensed to inspect or make inspection reports. Norman McCullough Depo., Ex. 17, p. 31, ll. 22-24; Mary McCullough Depo., Ex. 14, p. 28, ll. 11-17; Esposito Depo., Ex. 12, p. 29, ll. 3-5; Kalish Depo., Ex. 15, p. 29, ll. 19-22.

Defendants also misled homeowners into believing defendants enjoyed a professional relationship with Del Webb. Although Del Webb never conducted any inspections in conjunction with MCMC or authorized MCMC to act as its agent, defendants' solicitations were intended to and did mislead homeowners into believing that defendants' inspections were conducted by "representatives & experts from *both* MC Mojave Construction & [their] builder," when in fact the inspections were performed by defendants alone. PIO, ¶ 20; Dreyer Depo., Ex. 18, p. 14, ll. 8-13 ("I looked at Mojave as kind of the liaison between the senior citizens that lived there and dealing

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

8

with Del Webb.... [T]hat was my understanding of what Mojave was doing with Del Webb"); p. 16, l. 21 -p. 17, l. 4 ("I just looked at [Mojave] as a liaison so I didn't have to deal with Del Webb"); p. 28, l. 21 - p. 29, l. 12 (believed there was a liaison); Marilyn Hendrickson Depo., Ex. 16, p. 30, ll. 1-22 (based on defendants representations, she believed defendants "were working with Del Webb... to get things taken care of"); p. 31, ll. 31, ll. 13-20 (the only reason she agreed to defendants' services is that "they told me they would be working with Pulte to get my things resolved"); p. 35, ll. 3-14, p. 38, ll. 8-19 ("They told me that they were working with Del Webb and Del Webb would probably reimburse them. Well, would reimburse them. .... I understood that to mean they were an independent contractor who was working with Del Webb"); Mary McCullough Depo., Ex. 14, p. 27, l. 21 - p. 28, l. 1 ("They came along with Pulte").

### 2.   Fliers

The fliers defendants distributed in Sun City Anthem were meant to mislead homeowners as to defendants' authority to inspect, the existence of a relationship with Del Webb, and the cost of the inspection services. See Exs. 19-21 (Depo. Exs. 33-35), all made and distributed by Wilson or at his direction, inviting homeowners to obtain a "**FREE** HOME EVALUATION" through either CDS or MCMC, "Construction Investigations & Consulting, Licensed General Contractor....") (emphasis supplied). Wilson Depo., Ex. 3, p. 101, l. 3 - p. 103, l. 23. One of those fliers (Ex. 20) stated that "After a close inspection by MC Mojave Construction, *helping the homeowners, and the Builder's inspection* team, certain construction items have been found to be deficient and are now being repaired at no cost to the homeowners." See also PIO, ¶ 21; and Complaint Ex. 1, another solicitation making similar and other misstatements:

THE NEW 'RIGHT TO REPAIR' LAW IN NEVADA
....
Under the new law homeowners have the right to have the builder make the necessary home repairs to homes that show code violations or work performed under industry standards. Your options are:
1)   HOMEOWNERS can notify the homebuilder via Certified Mail

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

9

with return receipt requested, explaining that MCMC [Mojave] has conducted an evaluation and discovered construction defects or manufacturer's specification not being adhered to. Homeowners should be aware of the process outlined in Chapter 40 of the Nevada law if they intend protect [sic] their own rights.

    2)     INSPECTION TEAMS can help the homeowners through the process by representing the interest of the homeowners when the builder and subcontractors do their walk through; make sure the repairs are within code requirements or manufacturers specifications; complete the process by doing a final walk through inspection with the homeowners. The law states that you can be reimbursed for any reasonable expert fees. Be sure that the company you hire offers you a **Risk Free Service Agreement**. These companies look to be paid for their services <u>only</u> if you receive reimbursement from the builder.

    3)     LEGAL FIRMS THAT HANDLE CHAPTER 40 CLAIMS. A law firm can make sure the builder will honor his responsibility and ensure that your legal warranty period is <u>protected and extended</u>. The law firm will also hire their own inspection teams to protect you from shoddy workmanship by subcontractors. Again make sure that the law firm will sign a **RISK FREE or CONTINGENCY FEE AGREEMENT**.

If you are not familiar with a law firm that handles Chapter 40 claims, we can provide the names of three law firms that are willing to help you.

If we can be of any further assistance please contact us at (702) 439-8504.

At Your Service

*MC Mojave Construction*   [Emphasis supplied.]

Complaint Ex. 1; Answer (Doc. 7) ¶¶17 and 18; PIO, ¶16.

Defendants admit their fliers' efficacy. Partington Depo., Ex. 1, p. 55, l. 18 - p. 56, l. 9 (the inspection division gets its business through phone calls in response to fliers, but the PIO barring use of the fliers stopped the phone calls: "Well, we had fliers out there but you made us stop putting them out. There's no more phone calls.").

    **3.**     **Placards**

Upon obtaining the consent of ***any*** Sun City Anthem homeowner to an inspection, defendants then distributed hundreds of placards throughout the community again misleading homeowners as to their authority, their relationship to Del Webb, and the cost of their services:

### * * * Notice to Neighbors * * *

As a courtesy, we are informing you that, due to a 'Builder' home inspection, you may experience a few hours of extra vehicular traffic in your neighborhood. These vehicles belong to representatives & experts from both MC Mojave Construction & your Builder, his subcontractors and agents.

This inspection has been scheduled for

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

_____

address & date

Once the Builder inspections are concluded, a repair plan and time-frame are provided to the homeowner for their review and approval.  The Builder's repairs are also 'free' to ALL homeowners under a Chapter 40 claim, even if you are not the original owner.

**If you have any question or if you want to know
if you qualify for a <u>FREE</u> home evaluation
Please Call (702) 439-8504**

MC Mojave Construction-Lic. #B-0025771   NN604

Complaint Exhibit 3, PIO ¶¶18-20.  Wilson drafted the placard and caused distribution of at least 350 of them in Sun City Anthem.  Diaz Depo., Ex. 2, p. 27, ll. 6-11; p. 29, ll. 1-2.  The placard's reference to a general contractor's license was intended to mislead homeowners into believing MCMC was licensed to perform inspections and make reports.  PIO, ¶19.

Defendants acknowledge they only used the placards in Sun City Anthem because of the homeowners' senior status.  PIO ¶¶10, 29; <u>See</u> Diaz Depo., Ex. 2, p. 29, ll. 4-7; p. 32, ll. 11-13 (the placards' use was "absolutely" related to the fact Sun City Anthem is a senior community); Wilson Depo., Ex. 3,  p. 80, l. 20 - p. 81, l. 8 ("Sun City Anthem, you had two different criterias of the people up there, and one of them is whenever there was a motion like that they didn't know if somebody died in the house or there was an accident.  They were very concerned as senior citizens"); p. 82, l. 24 - p. 83, l. 5 ("We never used this placard on any other tracts we were working on from any other builders because we didn't have the same fear factors").

Wilson also capitalized on the Sun City Anthem "fear factors" in overbearing sales tactics.[14] Schiff Depo., Ex. 22, p. 44, ll. 1-8 (describing Wilson -- "I still remember the feeling of pressured, slash, badgered.  I really was uncomfortable"); p. 67, ll. 16-17 ("John was very high pressure, very overbearing, made me uncomfortable"); Schiff Declaration, Ex. 23, ¶20 ("Mojave's sales tactics and

_____

[14] Wilson went door-to-door in Sun City Anthem to stir up claims for attorneys who paid him referral fees.  His reports contain what homeowners have described as "not real[] issues at all," and ones that could have been "easily [] repaired."  Ex. 36.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

11

inspections are misleading and deceitful. .... The... report tries to make it look like it is a really big

deal but all the problems we had were very minor").

### 4.   MCMC's Website

Wilson created MCMC's website, advertising a "Construction and Inspection Divisions,"

falsely claiming MCMC was licensed to inspect. Ex. 24 (Prelim Inj. Mot. Ex. 16); Wilson Depo.,

Ex. 3, p. 233, ll. 9-14. The website also urged homeowners to call for a "free home evaluation..."

and promoted its divisions in California, Arizona and Nevada. Id.; Id. p. 236, ll. 10-15.

### 5.   Defendants' Inspection Reports and Other Forms

Defendants' inspection reports falsely portray authority to inspect and prepare reports and the

existence of a commercial office:

## M C Mojave Construction

Construction Investigations & Consulting     Licensed General Contractor : B-0024771
5001 Jay Ave. -- Las Vegas, Nevada 89130 -- Inspection Division Phone 702-341-6068

Sample Inspection Report, Ex. 25. MCMC was really operated either out of Partington's home or a

mail box drop, and the "inspection division" operated out of Wilson's residence. Partington Depo.,

Ex. 1, p. 24, ll. 1-19; p. 150, ll. 12-19.

Forms defendants prepared as Chapter 40 notices and had homeowners sign furthered

defendants' deceit. See samples of such forms, Exs. 26-30, each stating in part:

> My home was *professionally inspected* recently and it was discovered that a
> number of constructional discrepancies currently exist. ....
> Enclosed, please find a copy of my *inspection report*. I am hopeful that the
> enclosed report will enable you to ascertain the extent of the discrepancies listed as
> I process this claim pursuant to NRS 40.645.
>      .....
> I am also including *an invoice from MC Mojave Construction reflecting
> the expense I have incurred for their report* and evaluate appropriate corrective
> measures. ....
> [P]lease contact MC Mojave Construction to schedule any appointments for
> inspections or repairs on my home. .... [Emphasis added.]

See PIO, ¶27. Homeowners did not understand that by using defendants' form letter they were

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

representing to Del Webb that they had incurred an expense for the inspections.  Schiff Depo., Ex. 22, p. 97, ll. 7-24 ("I didn't even realize that that is what it was saying.  I didn't understand this").

### 6. Defendants' Misrepresentations Disrupted Del Webb's Relationship with Homeowners and Fomented Chapter 40 Claims Which the Homeowner Claimants Did Not Understand

Defendants' contacts with homeowners were and are intended to foment Chapter 40 claims and disrupt Del Webb's relationship with homeowners under its warranty programs, including Del Webb's right to alternative dispute resolution.  See PIO, ¶26 (the "inspection reports... identified items... within the scope of the Del Webb Home Warranty"); and ¶28 (the "illegal inspections and structural reports" were used... "to commence NRS Chapter 40 lawsuits against Del Webb").

Defendants induced hundreds of homeowners to accept their so-called "free" inspections to commence Chapter 40 claims either through MCMC or through defendants' associated law firms by misrepresenting the nature and actual cost of their services.[15]  Homeowners did not understand that the money defendants anticipated receiving was part of the homeowner's settlements proceeds, instead thinking Del Webb was paying defendants directly.  Kalish Depo., Ex. 15, p. 28, ll. 4-13 ("I don't remember a money discussion.... In my mind this was a free service.  They would go to Pulte.  Pulte would take care of it.  I would never have gone with them or agreed to have gone with them if it was money.  There was no need to because we felt we had a warranty...."); Hendrickson Depo., Ex. 16,  p. 35, ll. 10-12 (MCMC "never asked me for money.  So I could only assume they were getting paid by Del Webb"); Slipock Depo., Ex. 32, p. 35, ll. 12-23 (assumed there was an agreement between the attorney and MCMC for payment: "I'm not paying for it..."); Coffin Depo.,

---

[15]   After signing up around 100 homeowners with MCMC as their Chapter 40 representative, defendants decided to only refer homeowners to law firms. Ex. 31; Wilson Depo., Ex. 3, p. 23, ll. 11-12; p. 94, ll. 18-21.  Defendants invoiced homeowners who went with MCMC $1,800 for the inspections. Id., p. 117, l. 24 - p. 118, l. 1.  MCMC then promoted Angius & Terry and Pollock and have homeowners sign retainer letters, often before the inspections.  Angius & Terry agreed to pay and paid MCMC $1,800, with $500 due when MCMC signed up a homeowner with them and the rest on successful conclusion of the Chapter 40 claim.  Pollock agreed to pay and pad $2,500, all due upon the successful conclusion of the Chapter 40 claim. Id., p. 62, ll. 12-13.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Ex. 33 p. 41, ll. 10-12 ("I have no idea what they were paid"); and Dreyer Depo., Ex. 18, p. 30, ll. 15-16 ("I really didn't know that there was going to be attorneys involved").

Defendants' inspection reports, however, were not "free" to homeowners, but part of any recoveries that belonged to the homeowner.[16]  Moreover, at depositions noticed by defendants, Sun City Anthem homeowners who had signed with lawyers promoted by defendants testified that they did not even understand they were part of Chapter 40 claims against Del Webb.  Esposito Depo., Ex. 12, p. 27, l. 22 - p. 28, l. 6 (he wasn't aware and did not understand that he had become part of a Chapter 40 claim against Del Webb ("Is that what I'm doing?") or that his claim had settled ("I'm not aware of it")); Dreyer Depo., Ex. 18 p. 26, ll. 3-7 (MCMC hired the lawyer on her behalf -- "I didn't decide on my own to hire an attorney…"); Weinberger Depo., Ex. 35, p. 27, ll. 5-7 (unaware she filed a Chapter 40 claim); p. 29, ll. 16-23 ("I don't have an attorney representing me" and Angius & Terry "were obviously retained through Mojave"); Schiff Depo., Ex. 22, p. 44, l. 22 - p. 45, l. 5 (although made a Chapter 40 claim, she said "I didn't really hire them"); p. 47, l. 23 - p. 48, l. 2 ("I thought that when I signed the papers to hire MC Mo[j]ave that they, in turn, took over the

---

[16]     Defendants concede MCMC's Chapter 40 Inspections and Evaluation Agreement with Sun City Anthem homeowners includes the following representations:

> Homeowner agrees:
> To include all MCM invoices for services rendered on behalf of homeowner by MCMC to the homebuilder and/or law firm if builder is represented by such via certified mail with return receipt request; If homeowner desires [Mojave] to send copies of said invoices to the builder and/or legal firm via certified mail please initial here ____

> Terms of payment:
> MCMC will ONLY collect said fee if or when the builder reimburses the Homeowner; Homeowner is not responsible to pay the fee *until the Homeowner receives reimbursement from the builder for inspection fees*.  However, *Homeowner assigns to MCMC the right to recover any and all inspection fees from the builder if the builder fails to pay all the inspection fees as outlined in NRS 60.645*.  [Emphasis added.]

Complaint Ex. 2; Answer (Doc. 7) ¶20; PIO ¶17; Ex. 34 (Depo. Ex. 10).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1   responsibility of approaching a law firm…").

2   Homeowners did not comprehend that if they backed out of the Chapter 40 claims process,

3   they were responsible for defendants' fees. See e.g. Ex. 34 (sample Angius & Terry fee agreement,

4   requiring homeowners to pay expenses upon termination of legal representation); Kalish Depo., Ex.

5   15, p. 31, l. 24 - p.32, l. 2. Per Angius & Terry's retainer letter, if a client ends representation and

6   then recovers from the builder (Del Webb), he is responsible to "pay **all** fees and costs." Ex. 40 at ¶

7   2(a), (b) (emphasis added). Recovery is defined as "goods and services of **any kind**." Id. at ¶ 2

8   (emphasis added). Thus, if Del Webb performs warranty work, e.g. services, Angius & Terry could

9   argue that the client obtains a recovery, entitling them to their fees. Also, if a client terminates the

10   services regardless of recovery, the client is "obligated to reimburse the firm for **any** litigation

11   expenses," presumably including the $500 fee Angius & Terry pays MCMC for the client referral.

12   
13   Id. at ¶ 7 (emphasis added). In fact, homeowners have reported the "free" inspections from MCMC

14   may end up costing them $300. Newmiller Letter, Ex. 46 (without enclosures).

15   Nor did homeowners understand that by signing up with attorneys or MCMC, they were

16   causing the end of all communications between them and Del Webb, in effect building a wall

17   
18   between them. Slipock Depo., Ex. 32, p. 37, ll. 5-8 (unaware his counsel had barred all

19   communications between Del Webb and claimants); Dreyer Depo., Ex. 18, p. 25, ll. 16-19. See also

20   Exs. 30-31 Prelim. Inj. Motion Exs. 36 and 37, respectively KVBC broadcasts of September 13,

21   2007, and May 15, 2008 (Prelim. Inj. Mot. Exs. 30-31).[17] Adding insult to injury, Angius & Terry

22   admits Del Webb's warranty department "still remains the quicker remedy." Garabedian E-Mail,
23

24   _____

25   [17]   On the 9/13/07 KVBC report, homeowner June Lowry said she did not realize that
    by signing defendants' papers she had tied up her home in a legal process preventing Del Webb

26   from performing warranty service: "They do a disservice to the homeowner by putting them into
    the Chapter 40 process on items in the home that are not really issues at all or could easily be

27   repaired." Ex. 36. The 5/15/08 KVBC report quoted homeowner Marilyn Schiff saying she felt
    high-pressured and then withdrew her claim: "They take advantage of people like myself. I'm not

28   claiming stupidity as a senior citizen, but we are a little naïve." Ex. 37. Two broadcasts also aired
    on KVBC on September 7 and 10, 2007. 9/7 and 9/10/07 transcripts, Ex. 42.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

15

1   Ex. 43.  Angius & Terry instructs MCMC, after Del Webb performs work pursuant to Chapter 40,

2   to not allow homeowners to add anymore defects, stating "I don't care how much the homeowner

3   begs and pleads during the walk through . . . [R]emind them that the purpose of the scope of the

4   Chapter 40 was to address roofing, concrete and stucco items.  We need to close these Chapter 40s

5   out as they are.  Otherwise, we will never get paid."  Garabedian E-mail, Ex. 44.

6       **D.      The Pending Lawsuit**

7           On May 8, 2008, Del Webb sued defendants seeking preliminary and permanent injunctive

8   relief and damages based on claims for: (1) champerty and maintenance; (2) violation of Nevada's

9   Deceptive Trade Practices Act; (3) violation of the Lanham Act under 15 U.S.C. § 1124(a)(1); (4)

10  intentional interference with contractual relationships; and (5) attorneys' fees under Sandy Valley

11  Associates v. Sky Ranch Estates Owners Ass'n, 117 Nev. 948, 35 P.3d 964 (2001).  Defendants

12  answered on June 13, 2008, essentially admitting Del Webb's allegations as to defendants'

13  representations to homeowners, but denying the other allegations and all claims for relief.

14      **E.      Defendants Violated the Preliminary Injunction Order**

15          On October 8, 2008, the Court entered its PIO (Doc. 34), barring:

16          [Defendants], and their affiliates and others acting in concert with Defendants
            [from] soliciting and/or performing residential inspections and/or providing
17          inspection reports in Sun City Anthem, or any other Del Webb Nevada
            developments, by means of illegal, unlicensed and false practices, such as the
18          representations, express or implied, that they, or any of them are (1) properly
            licensed under Nevada law to perform structural inspections; (2) properly licensed
19          under Nevada law … to perform, provide or communicate inspection reports;
            and/or (3) are acting as representatives or agents under the authority of Del Webb
20          or Pulte….

21          Defendants concede they conducted inspections and/or prepared and communicated inspection

22  reports to Sun City Anthem homeowners after the entry of the PIO.  Exs. 5 and 6 (post-PIO reports);

23  Diaz Depo. Ex. 2,  p. 64, l. 11-15; Wilson Depo., Ex. 3, p. 339, l. 21 - p. 340, l. 23.  Wilson also

24  acknowledged that the law firms he promotes advised him he could continue providing inspection

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

16

1    services.  Wilson Depo., Ex. 3, p. 342, ll. 5-21.  Wilson and his agents thus continue to operate

2    inspection services through both Partington and Franklin.  Id., p. 225, l. 23 - p. 227, l. 20.

3    **II.     Del Webb Is Entitled to Summary Judgment Adjudicating that Defendants' Inspections
            and Inspection Reports Were Illegally Made**

4

5         **A.     Defendants' Inspection Business Is Governed by NRS Chapter 645D**

6              NRS Chapter 645D governs inspectors of structures and appoints the Real Estate Division to

7    oversee their licensing.  NRS 645D.110(1).  NRS 645D.080 defines an "inspector" as "a person

8    who examines any component of a structure and prepares or communicates an inspection report."[18]

9    NRS 645D.060 defines an "inspection" as including a "physical examination… of the structural

10   components of a structure" and states that the "term includes any consultation regarding a structure

11   that is represented to be a certified inspection or ***any other title, word or other designation intended***

12   ***to imply or designate that the consultation is a certified inspection.***"  [Emphasis added.]  NRS

13

14   645D.070 defines an "inspection report" as "an analysis, opinion or conclusion regarding the

15   condition of a structure" that is:

16              1.      Provided after an inspection, in a written report, for or with the
         expectation of receiving compensation for the report; and

17              2.      Designed to describe and identify the inspected systems or structural
         components of the structure, their physical condition, any material defect and any

18       recommendation for evaluation by another person.

19              NRS 645D.160 requires a person who "engages in the business of, acts in the capacity of, or

20   advertises or assumes to act as an inspector" to first obtain a license from the Real Estate Division.

21   An applicant for such a certificate must comply with NAC 645D.210, which protects the public by

22   requiring an applicant's proof of requisite education, experience, and ability to produce an

23   appropriate inspection report, as follows:

24

25              (a)      proof of successful completion of not less than 40 hours of classroom instruction in

26

27   _____

     [18]      This statute clearly prohibits Wilson's practice of relying on the licensing of others
     to support his own activities.  See PIO, ¶ 44 ("a structural inspection license cannot be issued to an
     entity, only to an individual…").

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

17

subjects related to structural inspections in classes approved by the Nevada Real Estate Division;

   (b)    completion of an examination approved by the Real Estate Division;

   (c)    proof of observation of at least 25 inspections performed by a certified general inspector or a certified master inspector or by an instructor approved by the Real Estate Division;

   (d)    proof of a high school diploma or its equivalent; and

   (e)    demonstration of ability to produce a complete and credible inspection report according to the standards of NAC 645D.460-.580, inclusive.

   Other sections of NRS Chapter 645D require a licensee's proof of good character and financial responsibility, *i.e.*, payment of an investigation fee (NRS 645D.180(1)); fingerprinting and authorization for a criminal records search (NRS 645D.180(2)); proof of both errors and omissions and general liability coverage each in the amount of at least $100,000 (NRS 645D.190); and proof of payment of any child support obligations (NRS 645D.195).

   NAC 645D.460 establishes standards of professional conduct which specifically prohibit any relationships that would impair a certified inspector's impartiality, as follows:

   A certified inspector shall:
   1.    Perform his duties with the highest standard of integrity, professionalism and fidelity to the public and the client, with fairness and impartiality to all.
   2.    Avoid association with any person or enterprise of questionable character or any endeavor that creates an apparent conflict of interest.
   3.    Conduct his business in a manner that will assure his client of the inspector's independence from outside influence and interest which would compromise his ability to render a fair and impartial inspection.
   4.    Not disclose any information concerning the results of an inspection without the approval of the client or his representative for whom the inspection was performed.
   5.    Not accept compensation, financial or otherwise, from more than one interested party for the same service on the same property, without the consent of all interested parties.
   6.    Not, whether directly or indirectly, accept a benefit from, or offer a benefit to, a person who is dealing with the client in connection with work for which the inspector is responsible. As used in this subsection, 'benefit' includes, without limitation, a commission, fee, allowance, or promise or expectation of a referral for other work.
   7.    Not express the estimated market value of an inspected property while conducting an inspection.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

8.      Not use the term or designation 'state certified inspector' unless he is certified.

9.      Before the execution of a contract to perform an inspection, disclose to the client any interest of the inspector in a business that may affect an interest of the client.

10.     Not allow his interest in any business to affect the qualify or results of an inspection.

Defendants' agreements with Angius & Terry and Charles Pollock, which were undisclosed to homeowners, clearly violate NAC 645D.460's standards of professional conduct.

According to NRS 645D.900(2), it is a gross misdemeanor for an unlicensed person to (a) hold "himself out as a certified inspector," (b) use "in connection with his name the words 'licensed,' registered,' 'certified' or any other title, word, letter or other designation intended to imply or designate that he is a certified inspector," or (c) describe or refer to "any inspection report prepared by him as 'certified' or 'licensed' in this state, without first obtaining a certificate as provided by [NRS Chapter 645D]."

**B.      A General Contractor License Does Not Support Defendants' Inspection Business**

Even though the existence and language of NRS Chapter 645D appear insufficient to convince defendants of their need for inspectors' licenses to perform their business, the April 10, 1997 Minutes of the Assembly Ways and Means Committee further clarify the point. The testimony of Assemblyman Bernie Anderson on his bill to establish structural inspector licensing proves Nevada's intent to protect the public from unlicensed structural inspectors:

> The concern, Mr. Anderson continued, rested with the fact that in the construction world there were people who offered themselves as building inspectors who in fact did not meet any type of criteria in terms of testing or certification; and therefore, the unsuspecting homeowner subscribed to a program that ultimately may or may not give them a proper inspection of their property. *It was hoped the bill would establish a proper testing program* and would set up a licensing program for building inspectors so they would be properly reviewed in Nevada. This would ensure the *homeowner was not taken advantage of* and that anyone who performed an inspection would not be able to offer their services to the homeowner to fix the problem just identified. ....
>
> * * *
>
> Assemblyman Anderson stated currently there were 37 people who

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

provided services out of the telephone book in northern Nevada and 65 individuals in southern Nevada, who offered their services as a home inspector who may or may not be qualified.  AB 165 would limit certification to those people who passed the test.  It would give a standard for anyone in that profession and enable the homeowner to rely upon the fact that the state had indeed screened someone before he offered his services. ....

> Assemblyman Anderson stated that ***because someone was a contractor he was not necessarily qualified to be a home inspector.  A home inspector required a different level of criteria than to simply meet the requirements of a contractor***. ....  [Emphasis added.]

Assembly Minutes, Ex. 38 (Prelim. Inj. Mot. Ex. 33), at pp. 9-11.[19]  Tom Armstrong, a licensed home inspector, then answered questions of the Committee as to why a license other than a contractor's license should be required of structural inspectors:

> Mr. Armstrong offered that everyone he employed, including himself, was a Nevada state licensed general building contractor.  That, in his estimation, gave a license to build a home, not to necessarily be familiar with all the components of that structure. ....  He stated that many contractors dealt in specifics in terms of electrical, heating, and general building who may not be familiar with building at all.

Id., at p. 11.

Based on NRS 645D's legislative history, this Court has rejected defendants' arguments that a general contractor's license (or no license at all) suffices to support inspections of structures.  PIO, ¶44.  Del Webb is now entitled to partial summary judgment to that effect.

**III.   Del Webb Is Entitled to a Summary Judgment Adjudicating that Defendants Violated the Lanham Act, 15 U.S.C. § 1125(a)(1) and are Liable to Del Webb**

Del Webb's Third Claim is for violations of the Lanham Act, which at 15 U.S.C. §1125(a)(1), authorizes civil actions against those engaged in false advertising:

> (1)     Any person who, on or in connection with any goods or services... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
>         (A)     is likely to cause confusion, or to cause mistake, or to

---

[19] Wilson uses Chapter 40 to take advantage of homeowners and generate business for two law firms: Angius & Terry and Pollock.  As a reward for his illegal activities, Angius & Terry and Pollock agreed to pay and have paid MCMC referral fees.  Wilson anticipates almost $1 million in receivables.  Ex. 3, at 178, ln. 4 - 180, ln.14

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

20

deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

   (B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

According to the Ninth Circuit and this District Court, this means that a plaintiff must show:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

Fortunet , Inc. v. Gametech Arizona Corp., 2008 WL 5083812, *7 (D. Nev. 2008), *citing* Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

Falsity under the Lanham Act includes statements that are literally false, either facially or by necessary implication, or statements that are literally true, but likely to mislead or confuse. Fortunet, *supra*, 2008 WL 5083812, *7, *citing* Southland, 108 F.3d at 1139. Where a defendant ***intentionally*** misleads consumers or uses ***literally false solicitations***, as defendants have done here, a presumption arises that the public was in fact deceived and the burden shifts to the defendant to prove otherwise. Fortunet, *supra*, 2008 WL 5083812, *7, *citing* Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007); IGT v. Alliance Gaming Corp., 2007 WL 911773 (D. Nev. 2007) ("when evidence exists that defendant intentionally misled the public, courts presume that the statements deceived the public"), *citing* William H. Morris Co. v. Group W, Inc., 66 F.3d 255, 258-59 (9th Cir. 1995).

When a solicitation is literally false, the court need not inquire whether customers were actually misled: "A plaintiff is entitled to relief under the Lanham Act on proof of ***literal falsity alone***, as the court will assume that false statements actually mislead consumers." POM Wonderful

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1   LLC v. Purely Juice, Inc., 2008 WL 4222045, *11 (C.D. Cal. 2008) (emphasis added), citing U-

2   Haul Intl., Inc. v. Jartran Inc., 793 F.2d 1034 (9th Cir. 1986); and Harper House, Inc. v. Thomas

3   Nelson, Inc., 889 F.2d 197, 209 (9th Cir. 1989) (no need for actual evidence of consumer deception

4   where defendant intentionally deceived).

5       The materiality of defendants' misrepresentations is also clear. See POM, supra, 2008 WL

6   4222045, *11 ("A plaintiff may establish this materiality requirement by proving that 'the

7   defendants misrepresented an inherent quality or characteristic of the product"). Defendants

8   misrepresented both their legal authority to conduct inspections and the cost of their services. Such

9   misrepresentations went to the very heart of defendants' business, intended to mislead consumers as

10  to the skill, authority and state supervision of defendants' work and its cost, qualities to which

11  homeowners would naturally attach great importance. Id., where fruit juice manufacturer

12  misrepresented health benefits and purity of its product, important factors for consumer buying

13  decisions, its misrepresentations were deemed material.

14      Defendants' misrepresentations in this case were material and both literally false and

15  intentionally so. Defendants represented themselves to the public, including Sun City Anthem

16  homeowners, as licensed by Nevada law to conduct inspections and make inspection reports.

17  Defendants knew they had no inspection license under NRS 645D. Defendants knew that Wilson,

18  who had no license whatsoever (even the insufficient general contractor's license), ran defendants'

19  "inspection division" without any oversight but his own. Defendants' action intentionally misled

20  the public and their message reached Del Webb residents, disrupting Del Webb's home warranty

21  servicing program and warranties. As a result, the presumption applies and the Court may now

22  adjudicate defendants liable under the Lanham Act.

23      Where there is no genuine issue of material fact, the Court may properly resolve liability for

24  violation of the Lanham Act by summary judgment and enjoin further violations by permanent

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

22

1    injunction. Earthquake Sound Corp. v. Bumper Industries, Inc., 1999 WL 638681 (9th Cir. 1999).

2    **IV.   Del Webb Is Entitled to a Summary Judgment Adjudicating that Defendants Violated the Nevada Deceptive Trade Practices Act, NRS 598.0915(1), (2), (3) and (4), and NRS 598.0923(1) and are Liable to Del Webb under NRS 41.600(2) and (3)**

3

4    Del Webb's Second Claim alleges violations of Nevada's Deceptive Trade Practices Act,

5    which at NRS 598.0915(1)-(4) defines a deceptive trade practice as (1) the knowing false

6    representation of services as those of another; (2) the knowing false representation of the source,

7    sponsorship, approval or certification of services; (3) the knowing false representation of affiliation,

8    connection, association with or certification of another; and (4) deceptive representations of

9    geographic origin in connection with services. NRS 598.0923(1) defines a deceptive trade practice

10   as occurring when a person, in the course of his business or occupation, knowingly "[c]onducts the

11   business or occupation without all required state, county or city licenses." NRS 598.0953 further

12   provides:

13
14           1.      Evidence that a person has engaged in a deceptive trade practice is
15       prima facie evidence of intent to injure competitors and to destroy or substantially
         lessen competition.
16           2.      The deceptive trade practices listed in NRS 598.0915 to 498.0925,
         inclusive, are in addition to and do not limit the types of unfair trade practices
17       actionable at common law or defined as such in other statutes of this State.

18   NRS 41.500(2)(e) then provides that an action may be brought by anyone who is a victim of

19   consumer fraud, meaning the commission of deceptive trade practices as defined in NRS 598.0915

20   to 598.0925, inclusive. See also Southern Service Corp. v. Excel Building Services, Inc., 2007 WL

21   2325203, *2 (D. Nev. 2007) ("Nevada law allows a competitor to sue under the consumer fraud

22   statutes when that competitor can demonstrate it was directly harmed by the defendant's deceptive

23   trade practices").

24
25       Defendants have conducted their business with false representations as to their authority to

26   inspect and prepare inspection reports, the cost of their services, the existence of some affiliation or

27   relationship with Del Webb, and the legal effect of the documents they pressured consumers into

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1  signing.  Defendants' actions harmed Del Webb by causing the disruption of Del Webb's

2  relationship with its homeowners in general and under warranty programs.  Defendants are thus

3  liable to Del Webb for violation of Nevada's deceptive trade practices laws.

4  **V.  Del Webb Is Entitled to a Summary Judgment Adjudicating that Defendants' Actions**

5  **Constitute Champerty and Maintenance for which Defendants Are Liable**

6  Maintenance is the supporting or promoting of the litigation of another.  7 *Williston on*

7  *Contracts* § 15:1 (4th ed.).  Champerty is a bargain to divide the proceeds of litigation between the

8  owner of the litigated claim and the party supporting the litigation.  Id.; see also Schwartz v.

9  Eliades, 113 Nev. 586, 589, 939 P.2d 1034, 1036 (1997), *citing* Lum v. Stinnett, 87 Nev. 402, 407-

10  408, 488 P.2d 347, 350 (1971) ("To maintain the suit of another is now, and always has been, held

11  to be unlawful, unless the person maintaining has some interest in the subject of the suit").[20] Lum,

12  id., continues:

13

14  Maintenance exists when a person without interest in a suit officiously

15  intermeddles therein by assisting either party with money or otherwise to prosecute
    or defend it. ….  Champerty is the maintenance with the additional feature of an

16  agreement for the payment of compensation or personal profit from the subject
    matter of the suit. ….

17  Prohibitions against champerty and maintenance "are designed to cure the malicious stirring-

18  up of litigation that would not otherwise have occurred, often by means of lawyers or others

19  obtaining assignments 'to enforce claims other than their own.'"  Elliott Associates, L.P. v. Republic

20  of Peru, 948 F.Supp. 1203, 1208 (S.D. N.Y. 1996).  See also Rancman v. Interim Settlement

21  Funding Corp., 789 N.E.2d 217, 220 (Ohio 2003), *quoting* 14 Corpus Juris Secondum 1(1991),

22  *Champerty and Maintenance*, §3 ("The doctrines of champerty and maintenance were developed at

23  common law to prevent officious intermeddlers from stirring up strife and contention by vexatious

24

25

26  ───────────────

27  [20]  In Schwartz, the Nevada Supreme Court reversed the trial court's finding of a
    champertous agreement on the grounds the promisor, as a part owner of two corporate plaintiffs,
    had an interest in the lawsuit and thus no stranger to it.  113 Nev. at 590-91, 939 P.2d at 1037.
    Defendants here have no interest in the homes which are the subject of the Chapter 40 claims.

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

and speculative litigation which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law"), and holding that "a lawsuit is not an investment vehicle." Rancman invalidated a contract between a car accident victim and a settlement funding company by which the company, prior to resolution of the victim's suit with an insurer, forwarded funds in exchange for whatever amount plaintiff would collect from the insurer: "An intermeddler is not permitted to gorge upon the fruits of litigation."  The agreement stricken in Rancman operates precisely as defendants' agreement here -- nothing is owed by the homeowner for supposed expert inspection services until the case ends and then defendants reap "any and all" expert fees awarded. Echeverria v. Estate of Lindner, 2005 WL1083704, at *7 (N.Y. Sup. 2005), cites Rancman and bars an agreement funding litigation under doctrines of champerty and maintenance:

> People who ordinarily wouldn't proceed with a lawsuit may view this new situation as 'playing with the house's money' where it is now worth the time because anything they recover is more than what they would have recovered without this resource available, because without the funding the suit would have never been brought forward.  And if they lose they pay neither the principle nor the interest back to the company who funded the money.

In the context of construction defect litigation and defendants' conduct, NRS Chapter 40, designed to allow builders the opportunity to repair,[21] has in effect been hijacked by unlicensed

---

[21]    Shuette v. Beazer Homes Holdings Corp., 121 Nev. 837, 124 P.3d 530, 542 fn. 56 (2005), reverses a class action certification because NRS Chapter 40 "was enacted to promote settlement between homeowners and contractors and to afford contractors the opportunity to repair their work in the face of dissatisfaction…" and states:

NRS Chapter 40 provisions reveal… the legislature intended to provide contractors with an opportunity to repair defects in homes, a goal that should not be inhibited by class action certification. [W]hen class actions… would tend to deprive a contractor of the opportunity to repair the defects, instead of forcing it into a class damages settlement or trial, the class action method of adjudication is not superior to individual actions. [C]lass action treatment would not be superior if it is likely to force homeowners who do not suffer from home defects to disclose defect litigation to prospective buyers. … [C]lass actions may not be suitable for many constructional defect cases, given the manner in which the NRS Chapter 40 framework provides for dispute resolutions.
[S]ingle-family residence constructional defect cases will rarely be appropriate for class action treatment. … [W]here specific characteristics of different land parcels are

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

"experts" or "inspectors" who, unlike experts in any other litigation setting, are paid for drumming up business regardless of the end result. John Boyden, "Chapter 40 and Construction Defect Litigation -- Boom or Bust?" 10-JAN Nev. Law., at 11 (2002) ("[n]o other body of law permits this type of expert cost recovery"). Boyden explains:

> [I]n personal injury law, the prosecuting attorney does not recover the costs of an investigator, who may inspect the scene of the car accident to determine if liability exists. This also holds true in the medical malpractice field. The monies spent to pay an expert to review documents are not chargeable against the defense. This remains a cost to be borne by the plaintiff. This serves, as it should, as a deterrent. If the case has no merit, the plaintiff attorney will decide not to prosecute -- and no additional funds will be spent on a losing proposition.
>    Construction defect cases do not pose this same risk, however. *Even if the expert can only dig up one or two petty defects, this is enough to catapult the case into full-fledged litigation. The plaintiff attorney has no risk of losing this money because Chapter 40 will pay him back for all expert costs generated to initiate the investigation.* So even a tiny defect, that presents no true concerns for the homeowner, empowers the homeowner and attorney to proceed with a costly litigation.
>    *This area of law stands alone. Chapter 40 unabashedly creates a system that nearly guarantees litigation -- because the plaintiff has almost nothing to lose. All investigative and other expert costs will be repaid, as will all attorneys fees.* ....
> [Emphasis added.]

Defendants' misconduct (misrepresenting an association with Del Webb and authority to inspect) makes the "stirring-up" of litigation more extreme, literally fomenting a very profitable industry in an area where they are not authorized by law to even act.

## VI.   Del Webb Is Entitled to a Permanent Injunction Barring Defendants and Their Agents from Conducting Their Illegal Inspection Businesses in Del Webb Communities

The Court's October 8, 2008, PIO did not cause defendants to cease illegal activities in Sun City Anthem. In defiance of the Court's Order, defendants persisted in their illegal inspection business. A permanent injunction is necessary given the serious harm that has continued and is likely to continue given defendants' cavalier disregard of Nevada statutes and the Court's

---

concerned, 'these uniqueness factors weigh heavily in favor of requiring independent litigation of the liability to each parcel and its owner.

Id., 124 P.3d at 542-43 [footnotes omitted].

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Preliminary Injunction Order.  Defendants' have no countervailing equities on their part and a

permanent injunction is necessary to protect both Del Webb and the public against defendants'

continued illegal business.  See POM, 2008 WL 4222045, *16 (where the public was deceived into

paying for products it believes to be as advertised, permanent injunctive relief was appropriate),

citing Kennedy Industries, Inc. v. Aparo, 416 F.Supp.2d 311, 317 (E.D. Pa. 2005) ("There is a

strong public interest in preventing false advertising of products in the marketplace"); Resource

Lenders, Inc. v. Source Solutions, Inc., 404 F.Supp.2d 1232, 1249, 1250 (E.D. Cal. 2005) (public

interest served by injunction preventing likelihood of confusion); and Church & Dwight Co., Inc. v.

S.C. Johnson & Son, Inc., 873 F.Supp. 893, 912 (D. N.J. 1994) (enjoining deceptive advertising

because "the public has a right not to be deceived or confused").

Nevada's legislature decided to protect the public from unlicensed home inspectors.  Since

1985, 32 states have regulated residential inspections.  American Society of Home Inspectors,

"Position Statement on Regulation of Home Inspectors" (10/07).  To permit unlicensed individuals

to conduct illegal inspections would be to permit practices legislatures have seen fit to prohibit.  See

e.g. Brady v. Posse, 2007 WL 519273, *2 (N.Y. City Civ. Ct. 2007), enforcing New York's

licensing laws by rejecting the testimony of an unlicensed inspector in a mold damage cast:

> *[T]he legislative intent [is] clear that the purpose of the licensing statute*
> *is to protect the public, the Court cannot entertain the witness' testimony* no
> matter how sincere and accurate it may have been.  *To do so would negate the*
> *intent of RPL Article 12-b and would permit a continuous stream of unlicensed*
> *'home inspectors' to render opinions, a practice which the legislature has*
> *sought to eliminate.*  [Emphasis added.]

Defendants' continued illegal inspections and dissemination of legal advice violates Nevada

law, is a nuisance per se, and is subject to permanent ban.  Gebbie v. Olson, 828 P.2d 1170, 1172

(Wash. App. 1992) ("There is no constitutional right to practice prosthetic dentistry without a license

nor is there a constitutional right for patients to obtain prosthetic dental services from unlicensed

persons"); id., at 1173 ("engaging in any business or profession in defiance of the law is a nuisance

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

27

*per se* and subject to injunction"); <u>Marsland v. Pang</u>, 701 P.2d 175, 187 (Haw. 1986) ("Appropriate

circumstances to justify injunctions... exist in the field of professional or occupational licensing

statutes. [T]he statutory requirements are the legislative expressions of the public policy of the state

and the operation of such a profession or occupation without a license is *per se* irreparable injury to

that expressed public policy"); and <u>Heib v. Arches Financial</u>, 2008 WL 4601602, *4-5 (E.D. Wash.

2008) (lawyers' unlicensed debt collections violated the law *per se* and "unless enjoined will

continue to harm the public interest by causing Plaintiffs and other similarly situated to pay

collection charges that are unfair[,] deceptive, unlawful and an unfair method of competition").

Misleading solicitations of unlicensed "expert" defendants constitute champerty and

maintenance and are properly enjoined.  <u>Westmoreland County v. Rogers</u>. 693 A.2d 996 (Pa.

Cmwlth. 1997) (consultant barred from soliciting of taxpayers to allow him to make tax appeals for

them, but for his benefit); and <u>Green v. Wyrick</u>, 428 F.Supp. 732 (D. C. Mo. 1976) ("jailhouse

lawyer" banned from filing future writs for inmates to secure his occasional releases).

Finally, proof of actual injury and resulting damages is unnecessary to obtain an injunction

under the Lanham Act.  <u>Southland</u>, *supra*, 108 F.3d at 1145-46; <u>Fortunet</u>, *supra*, 2008 WL 5083812,

*15.  Injunctive relief without reference to impact on the public is appropriate where solicitations

are literally false.  <u>Smithkline Beecham Consumer Healthcare v. Johnson & Johnson-Merck</u>

<u>Consumer Pharm. Co.</u>, 906 F.Supp. 178, 181 (S.D. N.Y. 1985).

**VII.    Conclusion**

After his conviction for insurance fraud associated with his roofing contractor's license in

California, Wilson came to Nevada and began his home inspection business.  At first, he worked

without a license for a coalition of trade unions (RSL), but he eventually formed a company, or at

least a "division."  He concentrated on age-restricted communities, such as Sun City Anthem.  His

business was termed  an "inspection division" and affixed itself first to CDS.  Wilson explained he

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

28

had to "go look for a license" because he assumed his inspection activities required a B-2 contractor's license. The "inspection division" simply paid 25% of its profits to CDS for use of its inapplicable B-2 license (actually Partington's license). When the CDS relationship fell apart, Wilson moved his "inspection division" to MCMC, Partington's sole proprietorship. Wilson made the same 75/25% deal with Partington, who Wilson termed his "financial partner."

Wilson "trained" two "inspectors" and the three of them were responsible for the inspections and reports that launched 546 Chapter 40 notices in Sun City Anthem. Wilson's inspections comprise over 80% of the Chapter 40 claims in that community of over 7,000 homeowners.

Wilson walked door-to-door, representing he was licensed to perform home inspections, using fliers deceptively claiming an association with the developer, and signing up homeowners on lawyer retainer letters he carried with him (and which, often unknown to homeowners, committed them to Chapter 40 actions, often before the inspection was performed). Homeowners signed the documents Wilson handed them because he described the inspections as "free." But, MCMC's agreements with homeowners "assigned" the homeowners' rights to recover costs at the end of the matter to MCMC and the attorney retainer letters had similar assignments to the lawyers. In sum, homeowners who completed the Chapter 40 proceedings ended up paying defendants at least $1,800 for the "free" inspections. Most homeowners deposed to date did not and do not understand that it was *their* money that was paid to defendants. Wilson simply acted as a "runner" who by champerty and deception solicited seniors for a few construction defect lawyers.

Based on the arguments and evidence presented (principally documents produced by defendants) on Del Webb's motion for preliminary injunction, the Court decided that (1) defendants' actions are governed by NRS Chapter 645D, (2) defendants' lack required Chapter 645D licenses; (3) defendants' actions constituted materially false and deceptive advertising and solicitation, irreparably injuring Del Webb; (4) it is proper to enjoin the conducting of a business or profession in

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

29

violation of a law requiring a license; (5) defendants' deceptions were intended to cause residents of Sun City Anthem, including "elderly persons" as defined by NRS 598.0933, to believe defendants were acting as agents of or with the authority of Del Webb; (6) defendants misleading solicitations and agreements fall within the prohibition of champerty and maintenance; and (7) defendants threaten to continue their illegal actions, threatening Del Webb with irreparable injury.

The evidence in this case (including statements of defendants and the lawyers they promote, homeowners, local news reports, and Nevada's legislative intent) proves that defendants, without proper license and by deceit, preyed on homeowners' fears and lack of understanding of construction to foment Chapter 40 claims, generating fees for themselves and the lawyers they promote.  Del Webb is entitled to summary judgment adjudicating (1) defendants and their agents to have solicited, performed or supervised residential inspections, and prepared or supervised the preparation and communication of inspection reports for homeowners in Del Webb Southern Nevada projects, including the Sun City Anthem, misrepresenting to homeowners defendants' legal authority to perform those inspections and to prepare and communicate inspection reports, the existence of a relationship with Del Webb, the cost to the homeowners of the inspections, all in violation of Nevada law and the PIO; (2) defendants are liable to Del Webb for violation of the Lanham Act; (3) defendants are liable to Del Webb for violation of the Nevada Deceptive Trade Practices Act; (4) defendants are liable to Del Webb for champerty and maintenance; and (5) defendants and their agents must be permanently enjoined from conducting inspections and making and communicating inspection reports in any Nevada Del Webb community.

LIONEL SAWYER & COLLINS

By _____
Todd M. Touton, Esq., #1744
300 South Fourth St., Suite 1700
Las Vegas, NV 89101

Attorneys for Plaintiff, Del Webb Communities, Inc.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

## CERTIFICATE OF SERVICE

I certify that on the 17th day of February, 2009, I served a true and correct copy of the

foregoing Motion for Partial Summary Judgment by e-service on:

Michael J. Nuñez, Esq.
MURCHISON & CUMMING, LLP
6900 Westcliff Drive, Suite 600
Las Vegas, NV 89145

Charles M. Pollock, Esq.
LAW OFFICES OF CHARLES M. POLLOCK
10161 Park Run Dr., Suite 150
Las Vegas, NV 89145

Attorneys for Defendants


An Employee of LIONEL SAWYER & COLLINS

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

31

**Exhibits**

1    Charles Partington Deposition (11/18/08)

2    Marcos Diaz Deposition (12/16/08 and 1/6/09)

3    John Wilson Deposition (12/1/08 and 1/6/09)

4    Vincent Farruggia Deposition (12/18/08)

5    10/22/08 Inspection Report (Depo. Ex. 43)

6    12/15/08 Inspection Report (Depo. Ex. 44)

7    Collected documents evidencing how defendants held themselves out to the public as licensed under Nevada law to perform inspections (Depo. Exs. 6 (Mojave placard); 7 (Mojave sample service request); 8 (Mojave sample notice); 9 (Mojave sample Chapter 40 notice; 10 (Mojave sample Inspection and Evaluation Agreement); and 11 (Mojave sample Visual Evaluation Report))

8    6/20/07 Management Agreement (Depo. Ex. 28)

9    MCMC Receivables (Depo. Ex. 27)

10   Wilson's 10/7/08 Answers to First Set of Interrogatories (Depo. Ex. 31), Answer No. 4

11   Wilson's 11/24/08 Answers to Second Set of Interrogatories (Depo. Ex. 38), Answer No. 4

12   Leonard Esposito Deposition (1/12/09)

13   Lawrence Cole Deposition (1/9/09)

14   Mary McCullough Deposition (1/9/09)

15   Gene Kalish Deposition (1/9/09)

16   Marilyn Hendrickson Deposition (1/9/09)

17   Norman McCullough Deposition (1/9/09)

18   Ellen Dreyer Deposition (1/12/09)

19   Flier (MCM00006-7, Depo. Ex. 33)

20   Flier (MCM00008-9, Depo. Ex. 34)

21   Flier (MCM00004-5, Depo. Ex. 35)

22   Marilyn Schiff Deposition (1/12/09)

23   Marilyn Schiff Declaration

24   License search re Mojave and Partington (Prelim. Inj. Mot. Ex. 16)

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

| 25 | 7/13/07 letter from Mojave to homeowner conveying "preliminary constructional defect report" (Prelim. Inj. Mot. Ex. 20) |
| 26 | Sample Chapter 40 notice (Prelim. Inj. Mot. Ex. 24) |
| 27 | Separation Agreement (Depo. Ex. 29) |
| 28 | 4/19/07 Chapter 40 notice to Del Webb (Depo. Ex. 49) |
| 29 | 3/30/07 Chapter 40 notice to Del Webb (Depo. Ex. 50) |
| 30 | 4/13/07 Chapter 40 notice to Del Webb (Depo. Ex. 48) |
| 31 | Mojave Invoice to Angius & Terry (Depo. Ex. 14-A) |
| 32 | Arthur Slipock Deposition (1/9/09) |
| 33 | Keith Coffin Deposition (1/9/09) |
| 34 | Sample Chapter 40 Inspection and Evaluation Agreement (Depo. Ex. 10) |
| 35 | Joan Weinberger Deposition (1/12/09) |
| 36 | 9/13/07 KVBC report (Prelim. Inj. Mot. Ex. 30) |
| 37 | 5/15/08 KVBC report (Prelim. Inj. Mot. Ex 31) |
| 38 | 4/10/97 Assembly Minutes (Prelim. Inj. Mot. Ex. 33) |
| 39 | Felony Complaint, Plea and Sentence (Depo. Ex. 96) |
| 40 | Furjanic Angius & Terry Retainer Letter (9/18/07) |
| 41 | Farruggia Time Sheet (9/28/07) |
| 42 | Transcripts of KVBC Broadcasts (9/7/07 and 9/10/07) |
| 43 | Garabedian E-mail (Depo. Ex. 62) |
| 44 | Garabedian E-Mail (Depo. Ex. 105). |
| 45 | Wilson E-Mail (Depo. Ex. 103) |
| 46 | Newmiller Letter (Depo. Ex. CC) |
| 47 | Affidavit of Lynda Sue Mabry, Esq. |

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

33