Todd M. Touton, Esq. #1744
Jennifer L. Braster, Esq. #9982
LIONEL SAWYER & COLLINS
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone: 702-383-8888
Fax: 702-383-8845
ttouton@lionelsawyer.com

Attorneys for Plaintiff, Del Webb Communities, Inc.

**UNITED STATES DISTRICT COURT**

**CLARK COUNTY NEVADA**

| | |
|---|---|
| DEL WEBB COMMUNITIES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CHARLES LESLIE PARTINGTON d/b/a M.C. MOJAVE CONSTRUCTION; JOHN WILSON, individually; and DOE INDIVIDUALS I-X, inclusive; and ROE ENTITIES I-X, inclusive, <br><br> Defendants. | Case No. 2:08-cv-00571-RCJ-GWF <br><br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF ISSUES** |

I.    **Introduction**

Defendants demand summary dismissal of all of Del Webb's claims based principally on their repeated, although unfounded, argument that it is legally and factually ***undisputed*** that defendants' inspection business does not require licensing under NRS Chapter 645D, but that such inspections are "properly undertaken by persons in the building industry and persons with knowledge and experience in identifying such issues." See *e.g.* Motion, p. 7, ll. 9-15; p. 12, ll. 9-10; p. 20, ll. 5-9; p. 21, ll. 3-6; p. 22, ll. 12-14.  Not only does defendants' argument misstate Nevada law, but it also lacks factual support.[1]

---

[1]    For example, defendants and their inspector employees have no real knowledge of building structures.  Wilson was a roofer in California before a felony conviction stripped him of any licenses and he moved to Nevada where he promoted various trade unions.  Wilson Depo., Exhibit 1, p. 11, l. 3 - p. 13, l. 6.  Wilson eventually found defendant Partington, presumably attracted by Partington's willingness to become involved in an illegal joint venture.  Id., p. 303, l. 2 - p. 304, l. 20.  And, although defendants argue Wilson was recognized and paid as an expert in

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    In fact, it is defendants' position that regardless of NRS 645D's condition of licensing

2    based on proof of training, financial and ethical responsibility, and the Court's Preliminary

3    Injunction Order (Doc. 34) specifically enforcing Chapter 645D against them, defendants may

4    nonetheless hold themselves out to the public as authorized by law to conduct so-called "free"

5    structural inspections, use their inspections to foment construction defect claims for the benefit of

6    associated counsel, and then recover upwards of $1 million at the cost of homeowners based on

7    their hundreds of illegal "free" inspections conducted at Del Webb's Sun City Anthem alone.

8

9        Since no reliable case, statute, legislative history, or treatise supports defendants' position,

10    defendants' analysis of Nevada statutes and common law is based on the opinions and conclusions

11    of three purported experts, two of whom opine as to the "context and purpose of this statutory

12    scheme [NRS Chapter 645D]" (Motion, p. 8, ll. 14-15), and one who opines that the prohibition

13    against champerty and maintenance no longer exists in Nevada.  Because it is the sole province of

14    the Court to decide domestic law, each of defendants' expert reports (Motion Exhibits B and C) is

15    inadmissible under Fed.R. Evid. 702.  Moreover, one of defendants' experts, Richard Franklin, is

16    also personally biased.  Mr. Franklin has not only violated the PIO by allowing his friend and new

17    business partner, defendant Wilson, to continue conducting illegal inspections, including within Sun

18    City Anthem, through Franklin's B-2 contractor's license for a return of 25% on Wilson's illegal

19    profits -- precisely the activity barred by the PIO, but he also conducts inspections himself with only

20    a B-2 contractor's license.  What else could be expected of Mr. Franklin other than his endorsement

21

22

23

---

24    Chapter 40 cases by mediators and builders, including Del Webb, Wilson testified he has never
      been retained as an expert. Motion, p. 6, ll. 9-13; Wilson Depo., Exhibit 1, p. 67, ll. 6-15 (Wilson

25    responding to attorney Charles Pollock: "Should I know what a CV is? And I thought you were
      using Richard [Franklin]"); Pollock/Wilson emails produced by defendants, Exhibit 2. Mark Diaz,

26    who conducted most of defendants' inspections, had worked at the City of Las Vegas Housing
      Authority in construction bidding and other purchasing duties. Diaz Depo., Exhibit 3, p._13, ll. 5-

27    17. Vince Farruggia, who took defendants' inspection photographs and prepared the inspection
      reports, worked in rebar fabrication and did some inspections on concrete and masonry work.

28    Farruggia Depo., Exhibit 4, p. 8, l. 23 - p. 12, l. 3.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

2

of illegal home inspections.[2]  Defendants' other inspection law "expert," Glenn Curtis, opines as to

the status of Nevada law and the propriety of defendants' conduct based on an entry in *Wikipedia*

and an article in a New Hampshire newspaper, substituting his conclusions as to statutory intent for

the actual reported intent of the Nevada Legislature.  Defendants' third expert, a California lawyer

touting expertise in legal ethics, concludes that Nevada no longer recognizes claims for champerty

and maintenance because there aren't many Nevada written opinions about it.[3]  However, none of

the opinions and conclusions of defendants' three experts is admissible under Fed.R. Evid. 702,

which imbues the bench alone with the duty of interpreting domestic law.

Defendants' other arguments also fail because their inspection business is based on

materially deceptive solicitations, conducted without proper license, operated through the

telephone and internet, violates Nevada prohibitions against champerty and maintenance,

intentionally interferes with Del Webb's warranty programs, entitles Del Webb to an award of its

fees, and merits entry of a permanent injunction, particularly since discovery has proved that

defendants were all undeterred by the Court's PIO and persisted in their illegal inspection

business, including within Sun City Anthem.

Defendants are not entitled to summary dismissal of Del Webb's claims against them.

Instead, Del Webb is entitled to summary judgment against defendants in accord with its motion

---

[2]    See Motion Exhibit C, Franklin's expert report, printed on letterhead advertising that with a general contractor B2 license he performs "Construction Property Condition Assessments, Environmental & Construction Defects Investigations."  Franklin's B2 license actually authorizes him to perform "[t]he construction and remodeling of houses and other structures which support, shelter or enclose persons or animals or other chattels, and which do not extend more than three stories above the ground and one story below the ground."  NAC 624.170(2).

[3]    Mr. Kehr reasons champerty and maintenance no longer exist in Nevada because he found only 12 reported decisions mentioning it.  However, he may be unaware that Nevada, unlike California, has no intermediate courts of appeal.  For example, California court statistics for 2006-2007 indicate that the state's six intermediate courts of appeal issued 10,560 written opinions while its Supreme Court issued 113 opinions.  By contrast, the Nevada Supreme Court issued 90 written opinions in 2008, not coming close to the volume of written opinions published by the California judiciary (which has had the intermediate courts since 1903).  See Nevada and California reports on the judiciary, collected at Exhibit 17.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    for summary judgment, filed February 17, 2009 (Doc. 55).

2    **II.    The Nevada Legislature Intended NRS Chapter 645D to Apply to Home**
3    **Inspections, Whether or Not Incident to Residential Sales**

4          Defendants do not dispute that they (1) conducted residential home inspections in Sun City

5    Anthem, an age-qualified community, without any NRS 645D license; (2) prepared and delivered

6    inspection reports used by the Angius & Terry and Charles Pollock law firms, among others, to

7    initiate NRS Chapter 40 construction defect claims against Del Webb, without any NRS 645D

8    license; (3) solicited homeowners' agreements to sign up as Chapter 40 claimants with related law

9    firms; and (4) anticipated receiving around $1 million on account of their inspection business to be

10   paid out of homeowner recoveries or, according to agreements with homeowners, by the

11   homeowners themselves in the event they terminated their Chapter 40 claims.  PIO, ¶¶ 5, 6, 28, 29,

12   32.  Wilson confirms he continued his illegal inspection business (through both associations with

13   Partington and with his friend/partner/expert Franklin) after entry of the PIO, including within Sun

14   City Anthem.[4]  Wilson argues his association with licensed general contractors, such as Partington

15   and Franklin, legally suffices to support his inspection business.  Defendants offer the "expert"

16   opinion Wilson's business partner, Franklin, in support of his theory.  Defendants' other

17   inspections expert, Mr. Curtis, opines that "Partington and Wilson are "'contractors' in-fact, by

18   definition and by Statute and are exercising their knowledge and 'license' in pursuit of that

19   vocation."  Curtis Report, Motion Exhibit C.

20         Defendants and their experts ignore the actual language of NRS 645D, its reported

21   legislative history, and this Court's Conclusion of Law No. 44 in the PIO, which states:

---

[4]      Wilson testified he moved his business to his friend, Richard Franklin, with whom he continues to perform and supervise residential inspections and reporting, including within Sun City Anthem, under the same 75/25% profit-split used with Mr. Partington.  Wilson Depo., Exhibit 1, p. 25, l. 5; p. 225, l. 17 - p. 226, l. 6; p. 227, ll. 18-19; Farruggia (Wilson employee responsible for preparing reports) Depo., Exhibit 4, p. 21, ll. 10-11 (as of 12/18/08, Farruggia was working for Wilson at Franklin's business).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

The Legislative History of NRS Chapter 645D demonstrates the Nevada Legislature's intention that *a contractor's building license would not suffice for inspectors of structures or components of structures*. A contractor's license issued by the Nevada State Contractors Board, such as *a B-2 license, does not suffice to support the inspection of structures, components of structures or issuance of inspection reports containing an analysis, opinion or conclusion regarding the condition of a structure or component of a structure* under NRS Chapter 645D. Also, a structural inspection license cannot be issued to an entity, only to an individual, according to NRS Chapter 645D.080. [Emphasis added.]

NRS Chapter 645D's reported legislative history was filed as Exhibit 33 in support of Del Webb's motion for preliminary injunction and is attached as Exhibit 5 hereto. In the April 10, 1997 Minutes of the Assembly Ways and Means Committee the purpose of Chapter 645D was made clear. The testimony of Assemblyman Bernie Anderson on his bill to establish structural inspector licensing proves Nevada's interest in protecting the public from unlicensed structural inspectors in general and not just in regard to real estate sales transactions, as defendants argue:

> The concern, Mr. Anderson continued, rested with the fact that in the construction world there were people who offered themselves as building inspectors who in fact did not meet any type of criteria in terms of testing or certification; and therefore, the unsuspecting homeowner subscribed to a program that ultimately may or may not give them a proper inspection of their property. It was hoped the bill would establish a proper testing program and would set up a licensing program for building inspectors so they would be properly reviewed in Nevada. This would ensure the homeowner was not taken advantage of and that anyone who performed an inspection would not be able to offer their services to the homeowner to fix the problem just identified. There were exclusions clearly within the bill that took care of the vast majority of people who may be called to a homesite to fix a roof, or a fence, or to give an estimate on the damages done as the result of an insurance accident or other incident. AB 165 came forward through one of Assemblyman Anderson's constituents and was a bill with which he philosophically agreed and therefore endorsed. Assemblyman Anderson stated Tony Armstrong, a registered home inspector, was present in the committee room and could give first-hand accounts of anecdotal information as to why AB 165 was necessary and what it hoped to accomplish.
>
>              * * *
>
> Assemblyman Anderson stated currently there were 37 people who provided services out of the telephone book in northern Nevada and 65 individuals in southern Nevada, who offered their services as a home inspector who may or may not be qualified. AB 165 would limit certification to those people who passed the test. It would give a standard for anyone in that profession and enable the homeowner to rely upon the fact that the state had

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

indeed screened someone before he offered his services. ....

*Assemblyman Anderson stated that because someone was a contractor he was not necessarily qualified to be a home inspector. A home inspector required a different level of criteria than to simply meet the requirements of a contractor.* Mr. Armstrong, he said, had a more technical response than that, but for several years that had tended to be the response that Assemblyman Anderson had heard. [Emphasis added.]

Exhibit 5, at pp. 9-11. Tom Armstrong, a licensed home inspector, then answered the

Committee's questions about why a license other than a contractor's license (such as B-2 general

contractors' license held by Partington and Franklin) should be required of structural inspectors:

Mr. Armstrong offered that everyone he employed, including himself, was a Nevada state licensed general building contractor. That, in his estimation, gave a license to build a home, not to necessarily be familiar with all the components of that structure. As a matter of fact, one did not really have to be familiar with any components of the structure as long as he could pass the test. He stated that many contractors dealt in specifics in terms of electrical, heating, and general building who may not be familiar with building at all.

Id., p. 11. The discussion clarified the Legislative intent to require that each person conducting a

home inspection be certified:

Mr. Hettrick asked if each employee was required to be certified such as in a business like Mr. Armstrong's, which had multiple employees. Yes, responded Ms. Buchanan [the Administrator of the Nevada Real Estate Division].

Id., p. 12.

Nothing in NRS Chapter 645D or its legislative history makes the distinctions defendants

urge -- which is that NRS 645D applies only to inspections preceding home sales and excludes

inspections for code violations.[5] Moreover, nothing in NRS Chapter 624 (governing contractor's

---

[5]     Code violations are not the sole bases for Chapter 40 claims and defendants did not solicit code violation investigations. NRS 40.615 thus defines "constructional defects" as (1) work in violation of law, including codes and ordinances; (2) work which causes damage to residence or appurtenances; (3) work which is not completed in a good and workmanlike manner in accordance with generally accepted standard of care for that type of construction; and (4) work which presents a risk of injury to person to property. Defendants' "Chapter 40 Inspections and Evaluation Agreement" says they will provide "a written report that will define what we believe to be code or manufacturer's violation or work that we feel is below industry standards...." Exhibit 6. Defendants' inspection reports do not even mention "code" violations in the cover letter to homeowners, but say: "This evaluation identifies the areas of concern pertaining to the

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1   licenses) authorizes licensees to conduct residential structural inspections.  In sum, NRS 645D is

2   the statutory scheme addressing persons who conduct inspections of the structures and their

3   components and it requires licensing in accord with its training, financial responsibility and

4   personal integrity requirements.

### III.   Defendants' Inspection Business Requires NRS Chapter 645D Licensing

Defendants inspect structures and prepare and communicate inspection reports that are

used to foment NRS Chapter 40 construction defect litigation.  NRS Chapter 645D governs such

activities and appoints the Real Estate Division to oversee inspection licensing.  NRS

645D.110(1).  NRS 645D.080 defines an "inspector" as "a person who examines any component

of a structure and prepares or communicates an inspection report."[6]  NRS 645D.060 defines an

"inspection" as including a "physical examination... of the structural components of a structure"

and states that the "term includes any consultation regarding a structure that is represented to be a

certified inspection or *any other title, word or other designation intended to imply or designate*

*that the consultation is a certified inspection*."  [Emphasis added.]  NRS 645D.070 defines an

"inspection report" as "an analysis, opinion or conclusion regarding the condition of a structure"

that is:

1.   Provided after an inspection, in a written report, for or with the

---

constructional defects and/or product manufacturer's recommendations discrepancies that were
documented at his residence.... Our report includes the following; the locations of the infractions,
defects and/or damages, photos of the occurrences and a brief description of the occurrences."
Exhibit 7 (a 2008 report prepared by the Wilson/Franklin joint venture).  All of defendants'
inspection reports contain the same four attachments:  (1) excerpts of the 2002 Concrete and Clay
Roof Tile Installation Manual for Moderate Climate Regions prepared by the Roof & Tile Institute;
(2) excerpts of the 9th ed. National Gypsum Construction Guide; (3) excerpts of the Stucco
Manufacturers Association Stucco Crack Policy; and (4) a single page of unknown origin titled
"Typical Weep Screed Detail" citing the 2000 ed. of the International Residential Code.  The first
three attachments address roof tile, interior drywall, and stucco, and are not part of any construction
code applicable to Sun City Anthem.  For example the 2002 Concrete and Roof Tile Installation
Manual was never adopted or codified and would not have applied to houses constructed before
2002, and the 2002 Weep Screed Detail has no application for roof systems.

[6]   This statute bars Wilson's reliance on the general contractor licenses of others.  PIO,
¶ 44 ("a structural inspection license cannot be issued to an entity, only to an individual...").

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

28

1

expectation of receiving compensation for the report; and
       2.     Designed to describe and identify the inspected systems or

2

structural components of the structure, their physical condition, any material
defect and any recommendation for evaluation by another person.

3

4

NRS 645D.160 requires a person who "engages in the business of, acts in the capacity of,

5

or advertises or assumes to act as an inspector" to first obtain a license from the Real Estate

6

Division. An applicant for such a certificate must comply with NAC 645D.210, which protects

7

the public by requiring an applicant's proof of requisite education, experience, and ability to

8

produce an appropriate inspection report, as follows:

9

10

(a)     proof of successful completion of not less than 40 hours of classroom instruction in subjects related to structural inspections in classes approved by the Nevada Real Estate Division;

11

(b)     completion of an examination approved by the Real Estate Division;

12

13

(c)     proof of observation of at least 25 inspections performed by a certified general inspector or a certified master inspector or by an instructor approved by the Real Estate Division;

14

(d)     proof of a high school diploma or its equivalent; and

15

16

(e)     demonstration of ability to produce a complete and credible inspection report according to the standards of NAC 645D.460-.580, inclusive.

17

Other sections of NRS Chapter 645D require a licensee's proof of good character and

18

financial responsibility, i.e., payment of an investigation fee (NRS 645D.180(1)); fingerprinting

19

and authorization for a criminal records search (NRS 645D.180(2)); proof of both errors and

20

omissions and general liability coverage each in the amount of at least $100,000 (NRS 645D.190);

21

and proof of payment of any child support obligations (NRS 645D.195).

22

23

NAC 645D.460 establishes standards of professional conduct which specifically prohibit

24

any relationships that would impair a certified inspector's impartiality, as follows:

25

A certified inspector shall:
       1.     Perform his duties with the highest standard of integrity,

26

professionalism and fidelity to the public and the client, with fairness and
impartiality to all.

27

       2.     Avoid association with any person or enterprise of questionable

28

character or any endeavor that creates an apparent conflict of interest.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

8

3.  Conduct his business in a manner that will assure his client of the inspector's independence from outside influence and interest which would compromise his ability to render a fair and impartial inspection.

4.  Not disclose any information concerning the results of an inspection without the approval of the client or his representative for whom the inspection was performed.

5.  Not accept compensation, financial or otherwise, from more than one interested party for the same service on the same property, without the consent of all interested parties.

6.  Not, whether directly or indirectly, accept a benefit from, or offer a benefit to, a person who is dealing with the client in connection with work for which the inspector is responsible.  As used in this subsection, 'benefit' includes, without limitation, a commission, fee, allowance, or promise or expectation of a referral for other work.

7.  Not express the estimated market value of an inspected property while conducting an inspection.

8.  Not use the term or designation 'state certified inspector' unless he is certified.

9.  Before the execution of a contract to perform an inspection, disclose to the client any interest of the inspector in a business that may affect an interest of the client.

10.  Not allow his interest in any business to affect the quality or results of an inspection.

Under NRS 645D.900(2), it is a gross misdemeanor for an unlicensed person to (a) hold "himself out as a certified inspector," (b) use "in connection with his name the words 'licensed,' registered,' 'certified' or any other title, word, letter or other designation intended to imply or designate that he is a certified inspector," or (c) describe or refer to "any inspection report prepared by him as 'certified' or 'licensed' in this state, without first obtaining a certificate as provided by [NRS Chapter 645D]."

**IV.  Defendants' "Expert" Opinions as to the "Context and Purpose" of NRS Chapter 645D Are Inadmissible**

Defendants present Curtis and Franklin's expert reports to explain the "context and purpose" of NRS Chapter 645D.  Motion, p. 8, ll. 14-16.  The admissibility of expert opinions is governed by Fed.R.Evid. 702, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"In ruling on a motion for summary judgment, the court can only consider admissible evidence." Chachas v. City of Ely, 2008 WL 4787120, *1 (D. Nev. 2008); Fed.R.Civ.P. 56.

It is well-settled that no expert may opine as to domestic law, the interpretation of which belongs to the court alone. Shuffle Master, Inc. v. MP Games LLC, 553 F.Supp.2d 1202, 1208-09 (D. Nev. 2008) (expert testimony as to the meaning of the law is inadmissible under Rule 702); In re: IPO Litigation, 174 F.Supp.2d 61, 65, 69 (S.D. N.Y. 2001) ("there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court"), *citing* Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness may not testify to the legal implications of conduct; the court must be the jury's only source of law"); Lawrence v. The Richman Group of Connecticut, 407 F.Supp.2d 385, 391, fn. 9 (D. Ct. 2005) (testimony of two NASD experts who argued that plaintiff complied with NASD Rules was inadmissible: "the proffered expert testimony is not competent for the purpose of espousing legal conclusions such as those offered here, i.e., that the circumstances alleged by plaintiff did not violate [the Rule]," and "[a]s a general rule an expert's testimony on issues of law is inadmissible"), *citing* Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 508-11 (2d Cir. 1977) ("we must be especially careful not to allow trials… to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law"); Burkhart v. Washington Metro. Area. Trans. Auth., 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards"); Weston v. Washington Metro. Area. Trans. Auth., 78 F.3d 682, 684, fn. 4 (D.C. Cir. 1996) ("An expert witness may not deliver legal conclusions on domestic law…."); and Las Vegas Sun v. Franklin, 74 Nev. 282, 294, 329 P.2d 867, 873 (1958) ("it was

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1   prejudicial error to admit the testimony of three attorneys as expert witnesses upon the issue of the

2   state of the law, an area of determination which the judge should have reserved to himself").

3       Messrs. Curtis and Franklin's expert reports meet none of Rule 702's requirements.  Their

4   opinions and conclusions as to Nevada law are not based on facts or data, are not the product of

5   reliable principles or methods, and have not been applied reliably to the facts of the case.  In fact,

6   Mr. Franklin, who conducts the same illegal inspections as defendants and has a 25% share in the

7   profits of Mr. Wilson's inspection business, is also barred as biased.  Coxcom, Inc. v. Chaffee, 2006

8   WL 1793184 (D. R.I. 2006) (opinion testimony excluded where it was unreliable and not

9   independent).  Mr. Curtis' reliance on *Wikipedia* and a New Hampshire newspaper to reach his

10  opinion that as "'contractors' in-fact," defendants properly perform the home inspections and make

11  inspection reports is also ill-placed.  Curtis 11/13/08 Report, Motion Exhibit C, at p. 1 (quoting

12  *Wikipedia* for authority that in Nevada a "home inspection is a non-invasive examination of a home,

13  often in connection with the sale of that home"); p. 11.[7]  As noted in Campbell v. Secretary of

14  Health & Human Services, 69 Fed.Cl. 775, 781 (Fed.Cl. 2006), *Wikipedia*, the "free, online

15  encyclopedia," is a website "that allows virtually anyone to upload an article" and create so-called

16  authority for his or her position.  The unreliability and irrelevancy of a New Hampshire newspaper

17  is obvious.  No part of defendants' inspection experts' reports is admissible they must be excluded.

### V.   Defendants' Expert's Conclusions as to Nevada Law on Champerty and Maintenance Are Also Inadmissible and Unavailing

Defendants demand dismissal of Del Webb's claims for violation of Nevada law

prohibiting champerty and maintenance based on the opinions and conclusions of another expert,

---

[7]    It is extraordinary that any "expert" would opine Wilson qualified to sell home inspection services to seniors based on his expert understanding of building codes applicable in Nevada when he holds no license and has never even attended a state-sponsored training course in Nevada.  Wilson Depo., Exhibit 1, p. 252, l. 9 - p. 253, l. 2.  And, as explained in Del Webb's motion for summary judgment (Doc. 55), to the extent Wilson was once licensed as a roofer in California, his licenses were all revoked upon his felony conviction there.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

11

California attorney, Robert Kehr, who says he is an expert in lawyer ethics. Motion Exhibit B. However, no lawyers are parties to this case and Mr. Kehr's opinions and conclusions as to domestic law are inadmissible under Rule 702 for the reasons discussed *supra* at § IV. Moreover, Mr. Kehr's opinion that claims for champerty and maintenance no longer exist in Nevada, is simply wrong.

There is nothing about Nevada law that supports defendants' argument that Nevada's common law claims for champerty and maintenance are no longer viable. In 1911, the Nevada legislature enacted NRS 1.030, which states that "[T]he common law of England, so far as it is not repugnant to or in conflict with the Constitution and the laws of the United States, or the constitution and laws of this state, shall be the rule of decision in all of the courts of the state." The editor's notes to the statute state that the common law rule against champerty and maintenance were adopted, which is confirmed by decisions of the Nevada Supreme Court and the U.S. District Court for Nevada, and publications of the Nevada State Bar spanning three centuries, *i.e.*, Gruber v. Baker, 20 Nev. 463, 23 P. 858, 862 (1890) ("The reason of the rule, as applied to champerty and maintenance, with us, is to prevent litigation and the prosecution of doubtful claims by strangers to them"); Prosky v. Clark, 32 Nev. 441, 109 P. 793 (1910); Dixon v. Pruett, 42 Nev. 345, 177 P. 11 (1919); Aeroville Corp. v. Lincoln County Power Dist. No. 1, 71 Nev. 320, 290 P.2d 970 (1955); Lum v. Stinnett, 87 Nev. 402, 408, 488 P.2d 347, 350 (1971) ("Maintenance exists when a person without interest in a suit officiously intermeddles therein by assisting either party with money or otherwise to prosecute or defend it. …. Champerty is maintenance with the additional feature of an agreement for the payment of compensation or personal profit from the subject matter of the suit. …. "To maintain the suit of another is now, and always has been, held to be unlawful, unless the person maintaining has some interest in the subject of the suit, or unless he is connected with the assignor by ties of consanguinity or

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

12

affinity");[8] <u>Molezzo Reporters v. Patt</u>, 94 Nev. 540, 579 P.2d 1243 (1978); <u>In re MGM Grand Hotel Fire Litigation</u>, 570 F.Supp. 913, 935 (D. Nev. 1983) (champerty not found because there was "no officious intermeddling or lack of interest" in the parties' various lawsuits); <u>Vosburg Equipment v. Zupanic</u>, 103 Nev. 266, 268, 737 P.2d 522, 523 (1987) ("In 1890 this court held that even in the absence of statute it was, under the common law of England, unlawful 'to maintain the suit of another' unless the person maintaining the suit 'has some interest in the subject of the suit'"); <u>Schwartz. v. Eliopulos</u>, 113 Nev. 586, 589-90, 939 P.2d 1034, 1036 (1997) ("A champertous agreement is one in which a person without interest in another's litigation undertakes to carry on the litigation at his own expense, in whole or in part, in consideration of receiving, in the event of success, a part of the proceeds of the litigation"); Felicia Galati, Assistant Bar Counsel, "Getting Involved in Getting Money for Your Civil Litigation Clients: An Ethical Quagmire," (Nevada State Bar, 11/1/06):

> Before reviewing the various ethical opinions in this area, it is useful to review the impetus for the Rule. The concerns addressed by this Rule arise out of the law of maintenance, champerty and barratry. 'Maintenance is defined as 'an officious intermeddling in a lawsuit by a non-party by maintaining, supporting or assisting either party, with money or otherwise, to prosecute or defend the litigation.' Champerty is only one form of maintenance which is defined as 'a bargain between a stranger and a party to a lawsuit by which the stranger pursues the party's claim in consideration of receiving a part of any judgment proceeds.' Barratry is defined as 'frequently exciting and stirring up quarrels and suits, either at law or otherwise.' All three were common law offenses and grounds for discipline. Such conduct was said to have a 'tendency to encourage unwanted and unmeritorious litigation, inflated damages, suppressed evidence, and suborned perjury.'[9]

---

[8]     In <u>Lum</u>, 87 Nev. at 410, 488 P.2d at 352, the Nevada Supreme Court denounces "Mary Carter" agreements, which are a type of secret settlement in which the settling parties agree to cooperate against a non-settling party and in which the settling party's liability is capped and often reduced if another settling party obtains a sufficiently large award against a non-settling party.

[9]     These Nevada authorities span three centuries and are not the equivalent of a judicially created claim as in defendants' case, <u>O'Melveny & Myers v. Federal Deposit Ins. Corp.</u>, 512 U.S. 79 (1994). Nevada law prohibits, and has long prohibited, the fomenting of litigation by those lacking a personal interest in the matter.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1

At Conclusion of Law No. 57 of the PIO, this Court decided:

2

> Maintenance is the supporting or promoting of the litigation of another. Champerty is a bargain to divide the proceeds of litigation between the owner of the litigated claim and the party supporting the litigation. 7 *Williston on Contracts* § 15:1 (4th ed.); Schwartz v. Eliades, 113 Nev. 586, 589, 939 P.2d 1034, 1036 (1997), *citing* Lum v. Stinnett, 87 Nev. 402, 407-408, 488 P.2d 347, 350 (1971). Defendants' misleading solicitations and agreements fall within the prohibition of champerty and maintenance and have harmed and continue to threaten to harm Del Webb. Linn v. Stinnett, 87 Nev. 402, 407, 488 P.2d 347, 350 (1971).

3

4

5

6

7

The Court's decision is in accord with Nevada law.

8

**VI.    Defendants Are Liable under Nevada's Deceptive Trade Practices Act**

9

Del Webb's Second Claim alleges violations of Nevada's Deceptive Trade Practices Act,

10

which at NRS 598.0915(1)-(4) defines a deceptive trade practice as (1) the knowing false

11

12

representation of services as those of another; (2) the knowing false representation of the source,

13

sponsorship, approval or certification of services; (3) the knowing false representation of

14

affiliation, connection, association with or certification of another; and (4) deceptive

15

representations of geographic origin in connection with services.  NRS 598.0923(1) defines a

16

deceptive trade practice as occurring when a person, in the course of his business or occupation,

17

knowingly "[c]onducts the business or occupation *without all required* state, county or city

18

19

*licenses*."  [Emphasis added.]  NRS 598.0953 further provides:

20

> 1.    Evidence that a person has engaged in a deceptive trade practice is prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition.
> 2.    The deceptive trade practices listed in NRS 598.0915 to 498.0925, inclusive, are in addition to and do not limit the types of unfair trade practices actionable at common law or defined as such in other statutes of this State.

21

22

23

24

NRS 41.500(2)(e) then provides that an action may be brought by anyone who is a victim of

25

consumer fraud, meaning the commission of deceptive trade practices as defined in NRS 598.0915

26

to 598.0925, inclusive.  See Southern Service Corp. v. Excel Building Services, Inc., 2007 WL

27

2325203, *2 (D. Nev. 2007) ("Nevada law allows a competitor to sue under the consumer fraud

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

14

1  statutes when that competitor can demonstrate it was directly harmed by the defendant's deceptive

2  trade practices").

3      Defendants have conducted and continue to conduct their business through false

4  representations as to their authority to inspect and prepare inspection reports, the cost of their

5  services, the existence of some affiliation or relationship with Del Webb, and the legal effect of

6  the documents they pressured consumers into signing.  Defendants' actions harmed Del Webb by

7  causing the disruption of Del Webb's relationship with its homeowners in general and under

8

9  warranty programs.  Defendants are thus liable to Del Webb for violation of Nevada's deceptive

10  trade practices laws.

11  **VII.  Defendants Acknowledge their Use of Interstate Commerce and Are Liable**
   **for Violation of the Lanham Act**

12

13      Del Webb's Third Claim is for violations of the Lanham Act, which at 15 U.S.C.

14  §1125(a)(1), authorizes civil actions against those engaged in false advertising:

15          (1)    Any person who, on or in connection with any goods or services...
   ***uses in commerce any*** word, term, name, symbol, or device, or any combination
16  thereof, or any false designation of origin, ***false or misleading description of fact,***
   ***or false or misleading representation of fact,*** which --
17          (A)    is likely to cause confusion, or to cause mistake, or to
   deceive as to the affiliation, connection, or association of such person with
18  another person, or as to the origin, sponsorship, or approval of his or her goods,
   services, or commercial activities by another person, or
19          (B)    in commercial advertising or promotion, misrepresents the
   nature, characteristics, qualities, or geographic origin of his or her or another
20  person's goods, services, or commercial activities, shall be liable in a civil action
   by any person who believes that he or she is or is likely to be damaged by such
21  act.  [Emphasis added.]

22  According to the Ninth Circuit and this District Court, this means that a plaintiff must show:

23

24      (1) a false statement of fact by the defendant in a commercial advertisement about
   its own or another's product; (2) the statement actually deceived or has the
25  tendency to deceive a substantial segment of its audience; (3) the deception is
   material, in that it is likely to influence the purchasing decision; (4) ***the defendant***
26  ***caused its false statement to enter interstate commerce***; and (5) the plaintiff has
   been or is likely to be injured as a result of the false statement, either by direct
27  diversion of sales from itself to defendant or by a lessening of the goodwill

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

28

15

1    associated with its products.  [Emphasis added.]

2    <u>Fortunet , Inc. v. Gametech Arizona Corp.</u>, 2008 WL 5083812, *7, 2008-2 Trade Cases P 76, 433

3    (D. Nev. 2008), *citing* <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d 1134, 1139 (9th Cir.

4    1997).

5         Falsity under the Lanham Act includes statements that are literally false, either facially or

6    by necessary implication, or statements that are literally true, but likely to mislead or confuse.

7    <u>Fortunet</u>, *supra*, 2008 WL 5083812, *7, *citing* <u>Southland</u>, 108 F.3d at 1139.  Where a defendant

8    ***intentionally*** misleads consumers or uses ***literally false solicitations*** (as defendants have done

9    here as to their authority to inspect, the cost of their inspections, and their affiliation with Del

10   Webb), a presumption arises that the public was in fact deceived and the burden shifts to the

11   defendant to prove otherwise.  <u>Fortunet</u>, *supra*, 2008 WL 5083812, *7, *citing* <u>Time Warner Cable,</u>

12   <u>Inc. v. DIRECTV, Inc.</u>, 497 F.3d 144, 153 (2d Cir. 2007); <u>IGT v. Alliance Gaming Corp.</u>, 2007

13   WL 911773 (D. Nev. 2007) ("when evidence exists that defendant intentionally misled the public,

14   courts presume that the statements deceived the public"), *citing* <u>William H. Morris Co. v. Group</u>

15   <u>W, Inc.</u>, 66 F.3d 255, 258-59 (9th Cir. 1995).

16        When a solicitation is literally false, as for example defendants' solicitation of a "free"

17   inspection which is actually paid by the homeowner, the court need not inquire whether customers

18   were actually misled: "A plaintiff is entitled to relief under the Lanham Act on proof of ***literal***

19   ***falsity alone***, as the court will assume that false statements actually mislead consumers."[10]  <u>POM</u>

---

[10]     In 1971, the FTC adopted 16 C.F.R. § 251.1 (1998), "Guide Concerning Use of the Word 'Free' and Similar Representations" ("Free Guidelines"), which states:

When making 'Free' or similar offers all the terms, conditions and obligations upon which receipt and retention of the 'Free' item are contingent should be set forth clearly and conspicuously at the outset of the offer so as to leave no reasonable probability that the terms of the offer might be misunderstood.  Stated differently, all of the terms, conditions and obligations should appear in close conjunction with the offer of 'Free' merchandise or service.  For example, disclosure of the terms of the offer set forth in a footnote of an advertisement to which reference is made by an asterisk or other symbol placed next to the offer, is

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    Wonderful LLC v. Purely Juice, Inc., 2008 WL 4222045, *11 (C.D. Cal. 2008) (emphasis added),

2    citing U-Haul Intl., Inc. v. Jartran Inc., 793 F.2d 1034 (9th Cir. 1986); and Harper House, Inc. v.

3    Thomas Nelson, Inc., 889 F.2d 197, 209 (9th Cir. 1989) (no need for actual evidence of consumer

4    deception where defendant intentionally deceived).[11]  Defendants claim there is nothing false

5    about their placard and that it was distributed merely to warn people about inspections about to

6    occur, but it is false, advertising among other things a "FREE" home inspection where such

7    inspections are hardly free, but either recouped from the homeowners' recoveries through the

8    Chapter 40 process or outright due from homeowners as where they might withdraw from the

9    Chapter 40 process.[12]

10

11

12        not regarded as making disclosure at the outset.
          [11]    Defendants misrepresent the grounds for Del Webb's opposition to over 60
13    homeowner depositions. Del Webb argued that it was not plaintiff's burden to prove the impact of
      defendants' literally false solicitations on homeowners.
14        [12]    Defendants completely ignore the actual terms of the agreements requiring payment
      out of homeowner recoveries or homeowners' pockets as in the event they withdrew from the
15    Chapter 40 process. See e.g. motion, p. 10, ll. 16-17, arguing that the agreement with
      homeowners required payment only if the event of a recovery from Del Webb. Homeowners did
16    not even understand (nor apparently do defendants) that the Angius & Terry fee agreement
      defendants presented them to sign actually required that homeowners pay expenses upon
17    termination of legal representation. Kalish Depo., Exhibit 18, p. 31, l. 24 - p.32, l. 2; sample
      homeowner agreement, Exhibit 6. For example, the letter that defendants had homeowners sign
18    calling for contingent attorneys fees and reimbursement of all litigation expenses: "Client shall
      reimburse Attorney for all litigation expense so advanced plus ten percent (10%) interest out of
19    Client's share of the recovery." Exhibit 19 (sample attorney contingency fee agreement).
      "Recovery" was defined by that letter as "the total amount obtained from any source and by any
20    means...." Id. And, if a homeowner terminated representation at any time, then he was
      responsible for payment. Defendants' Chapter 40 Inspections and Evaluation Agreement with Sun
21    City Anthem homeowners also included an assignment in favor of defendants:
          Homeowner agrees:
22        To include all MCM invoices for services rendered on behalf of homeowner by
          MCMC to the homebuilder and/or law firm if builder is represented by such via
23        certified mail with return receipt request; If homeowner desires [Mojave] to
          send copies of said invoices to the builder and/or legal firm via certified mail
24        please initial here ____
25
          Terms of payment:
26        MCMC will ONLY collect said fee if or when the builder reimburses the
          Homeowner; Homeowner is not responsible to pay the fee until the
27

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

17

1    The materiality of defendants' misrepresentations is clear. See POM, supra, 2008 WL

2    4222045, *11 ("A plaintiff may establish this materiality requirement by proving that the defendants

3    misrepresented an inherent quality or characteristic of the product"). Defendants misrepresented

4    both their legal authority to conduct inspections, the cost of their services to homeowners, and an

5    affiliation with Del Webb.[13] Such misrepresentations went to the very heart of defendants' business,

6    
7    intended to mislead consumers as to the skill, authority and state supervision of defendants' work

8    and its cost, qualities to which homeowners would naturally attach great importance. POM, id.

9    (fruit juice manufacturer's misrepresentation of health benefits and purity of its product, important

10   factors for consumers, were material). These are not mere statements of "puffery," as in defendants'

11   case, Time Warner, supra, 497 F.3d at 159 (2d Cir. 207) (some ads as to competitor's picture quality

12   were so grossly exaggerated that no reasonable consumer could believe them or take them at their

13   face value).[14]

14   
15        Defendants' misrepresentations were material and both literally false and intentionally so.

16   Defendants represented themselves to the public, including Sun City Anthem homeowners, as

17   licensed by Nevada law to conduct inspections and make inspection reports. Defendants knew

18   they had no inspection license under NRS 645D. Defendants knew that Wilson, who had no

19   

20        *Homeowner receives reimbursement from the builder for inspection fees.*
21   However, *Homeowner assigns to MCMC the right to recover any and all*
     *inspection fees from the builder if the builder fails to pay all the inspection*
22   *fees as outlined in NRS 60.645.* [Emphasis added.]
     Complaint Exhibit 2; Answer (Doc. 7) ¶20; PIO (Doc. 34), ¶17; Exhibit 6 (homeowner
23   agreement).
          [13]   At her March 6, 2009, deposition, homeowner Rosalind Flans testified it was her
24   impression "the whole time" that defendants and Pulte "were working together...." R. Flans
     Depo., Exhibit 22, p. 65, ll. 7-21 (the placard would "reinforce that idea).
25        [14]   Where there is literal falsity, as here, there is no need to demonstrate actual
26   confusion among customers. See defendants' case, Clorox Co. Puerto Rico. v. Proctor & Gamble
     Commercial Co., 228 F.3d 24, 38-39 (1st Cir. 2000) (holding statements, "Compare with your
27   detergent.... Whiter is not possible," were not subjective or mere puffery, but specific, measurable
     claims presented as statements of the truth. Defendants' statements in this case are actionable for
28   the same reason.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

18

license whatsoever (not even the insufficient general contractor's license), ran defendants' "inspection division" without any oversight but his own. Defendants' action intentionally misled the public and their message reached Del Webb residents, disrupting Del Webb's home warranty servicing program and warranties. As a result, the presumption applies and the Court may now adjudicate defendants liable under the Lanham Act.

Defendants' argument that they are entitled to dismissal of this claim because Del Webb has not shown that they caused their false statements to enter interstate commerce is astounding given Mr. Partington's description of the efficacy of defendants' fliers and placards[15] in prompting homeowner phone calls for service. Partington Depo., Exhibit 8, p. 55, l. 18 - p. 56, l. 9 (the inspection division gets its business through phone calls in response to fliers, but the PIO barring use of the fliers stopped the phone calls: "Well, we had fliers out there but you made us stop putting them out. There's no more phone calls."). Mr. Wilson confirmed defendants' use of an internet website promoting their business, testifying he created MCMC's website, advertising a "Construction and Inspection Divisions," thus falsely claiming MCMC was licensed to inspect. Website advertisement, Exhibit 9; Wilson Depo., Exhibit 1, p. 233, l. 9 - p. 235, l. 9. The website also urged homeowners to call Wilson's phone for a "free home evaluation...." Id. Wilson also conceded the webpage falsely advertised non-existent Arizona and California branches. Id. p. 235, ll. 10-15. Defendants' communications with lawyers about homeowners were made by email. Id., p. 232, l. 17 - p. 233, l. 2. Finally, defendants' inspection reports used to commence NRS Chapter 40 claims against Del Webb were prepared by communications made over the

---

[15]    Defendants' placard is discussed at length in Del Webb's motion for summary judgment (Doc. 55). Defendants say they distributed 350 of the placards when a builder's inspection took place. Defendants say they generally distributed ten placards on each side of the street where a builder's inspection was being held. Diaz Depo., Exhibit 3, p. 33, ll. 11-18. Del Webb reconstructed this distribution in Exhibit 10. Of the homes that would have received notices, Chapter 40 notices resulted in 35 instances, or a 10% advertising return. That return on advertising efforts is higher than in other marketing activities, i.e., out of a Sun City Anthem's approximate 7,000 homes, defendants obtained 546 inspections, slightly higher than a 7% return).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

19

1    internet, *i.e.*, integrating actual photos into a form maintained on a computer.  Wilson Id., p. 71, l.

2    1 - p. 72, l. 12; Farruggia Depo., Exhibit 4, p. 81, ll. 4-18.[16]  Use of the telephones, cell phones,

3    and of the internet constitute use of interstate communications.  Healthport Corp. v. Tanita Corp.

4    of America, 563 F.Supp.2d 1169, 1180-81 (D. Or. 2008) (cited by defendants, holds that an

5    internet website is an avenue of interstate commerce under the Lanham Act: "by posting the…

6    advertisements on their web sites, Healthport caused the false statements to enter interstate

7    commerce"); Gallup, Inc. v. Business Research Bureau, Ltd., 2008 WL 4857027, *5 (N.D. Cal.

8    2008), *citing* United States v. Sutcliffe, 505 F.3d 944, 953 (9th Cir. 2007) ("The internet is 'an

9    instrumentality and channel of interstate commerce'"); and United States v. Mitra, 405 F.3d 492,

10   496 (7th Cir. 2005) (cell phone calls are all a part of interstate commerce "because the

11   electromagnetic spectrum is securely within the federal regulatory domain").

12       There is no genuine issue of material fact as to defendants' violation of the Lanham Act

13   and the Court should now resolve liability against defendants by summary judgment and enjoin

14   further violations by permanent injunction.  Earthquake Sound Corp. v. Bumper Industries, Inc.,

15   1999 WL 638681 (9th Cir. 1999).

16   ### VIII.  Discovery Proves Defendants' Intent to Disrupt Del Webb's Relationship with Homeowners under Warranty Programs

17       Discovery proves defendants deliberately disrupted Del Webb's relationship with

18   homeowners under warranty programs in order to sign up clients with law firms for Chapter 40

---

Exhibit 10, Declaration of Kim Roser, a Del Webb litigation manager.

[16]    Defendants' case, Third Party Verification, Inc. v. Signaturelink, Inc., 492 F.Supp.2d 1314, 1324 (M.D. Fla. 2007), says it suffices that defendants' products "travel" in interstate commerce.  The Florida court held plaintiff's allegations that defendants falsely advertised web-based technology sufficed to state a Lanham Act claim.  Here, defendants' solicitations invite telephone response from consumers and result in the production of reports created and communicated by use of the internet, all vehicles of interstate commerce.  See also defendants' case, Highmark, Inc. v. UPMC Health Pan, Inc., 276 F.3d 160, 164 (3d Cir. 2001), although dealing with newspaper solicitations, observing that the term "commerce" as used in the Lanham Act means "all commerce which may lawfully be regulated by Congress," meriting a broad interpretation and extends "even to purely interstate activity if that activity substantially affects interstate commerce."

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

20

1   construction defect claims.  For example, emails produced in discovery by defendants reflect

2   communications between them and the Angius & Terry law firm acknowledging their opinion that

3   Del Webb warranty repairs are a faster remedy than the Chapter 40 process, *i.e.* Exhibit 20, a July 7,

4   2008, email produced by defendants stating "if the roofing conditions are really bad, [Angius &

5   Terry] would suggest continuing to try to work with Del Webb's warranty dept to get repairs. ***It still***

6   ***remains the quicker remedy***" (emphasis added); and Exhibit 21, a May 21, 2008, email produced by

7   defendants in which Angius & Terry urges defendants not to "add any more defects.  I don't care

8   how much the homeowner begs and pleads during the walk through.  Please remind them that the

9   purpose and scope of the Chapter 40 was to address roofing, concrete and stucco items.  We need to

10  close these Chapter 40s out as they are.  Otherwise, we will never get paid."[17]

11  Several homeowners testified they experienced delays in receiving warranty work because

12  of their Chapter 40 claims.  Rosalind Flans Depo., Exhibit 22, p. 82, ll. 22-25; Steven Flans Depo.,

13  Exhibit 23, p. 83, ll. 8-24; Marsha Miller Depo., Exhibit 24, p. 47, ll. 7-15; Barry Miller Depo.,

14  Exhibit 25, p. 49, ll. 2-5.  Mr. Miller testified that when he tried to end his Chapter 40 process,

15  defendants told him he had to complete the process or would be liable for their fee.  B. Miller

16  Depo., Exhibit 25, p. 46, ll. 9-18; <u>see also</u> B. Miller's Declaration, Exhibit 26, at ¶¶ 9-11,

17  explaining:

> 9.      We eventually found out that the purpose of Chapter 40 was to get
> work done if Del Webb was not doing anything.  For us, Del Webb had been great.
> They did anything that we needed done.
> 10.     I called Mojave to withdraw from the Chapter 40 and the individual
> I spoke with said we were bound to go through the Chapter 40 process and if we
> backed out, we would have to pay their fee.  They said that they did all this work
> and we'd have to pay their fee.
> 11.     We then called Angius & Terry and they let us withdraw because
> we told them Mojave had misrepresented what the Chapter 40 process was and
> what they were signing us up for.

---

[17]     These emails belie defendants' self-serving position that they "sought, first and
foremost, to provide homeowners with information about their homes."  Motion , p. 6, ll. 14-15.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Another homeowner, Anita Rosen confirms Mr. Miller's testimony, explaining she was sorry she opted to hire counsel:

> A    [T]he people I know who did not have an attorney had Pulte -- Pulte did everything to fix the house.  So I wanted to opt out of my attorney deal, and they want $500 for me to leave, which is ridiculous.  They claimed I signed the contract that states that.  Next time I should read what I sign, I guess.  Good idea.
> * * *
> Q    Who told you that?
> A    Angius & Terry.  I don't know the person there that told me that.
> Q.   They told you that your contract says you would have to pay $500 to opt out?
> A    Uh-huh.

Rosen Deposition, Exhibit 27, p. 13, l. 18 - p. 19, l. 7.  When asked if she was aware Angius & Terry had paid Mojave $500 when they referred her as a claimant, Ms. Rosen responded: "Oh my goodness.  I guess the answer is no, but now I feel as though I was taken. .... You can't trust anybody." Id., p. 17, ll. 9-16.

Homeowners did not understand that by signing up with attorneys or defendants, they were causing the cessation of all communications between them and Del Webb.  Rosen Depo., Exhibit 26, p. 17, ll. 5-14 ("I must be very stupid.  I never anticipated all of this.  I thought they were going to tell, Del Webb was going to fix it, end of story.  Why I went with the attorney?  I have no idea.  And of course I'm very sorry now, but I don't want to pay the $500..."); Slipock Depo., Exhibit 11, p. 37, ll. 5-8 (unaware his counsel had barred all communications between Del Webb and claimants); R. Flans, Depo., Exhibit 22, p. 74, l. 17 - p. 75, l. 10 (she did not request and was unaware Pollock told Del Webb not to communicate with her); Exhibit Dreyer Depo., Exhibit 12, p. 25, ll. 16-19.  See also Exhibits 13 and 14 , respectively KVBC broadcasts of September 15, 2007, and May 15, 2008 (Prelim. Inj. Mot. Exs. 30-31).

Under Nevada law, an action for intentional interference with contract relations is based on (1) a valid and existing contract; (2) defendant's knowledge of the contract; (3) defendant's commission of intentional acts meant to disrupt the contractual relationship; (4) actual disruption

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

of the contract; and (5) resulting damages.  <u>J.J. Industries, LLC v. Bennett</u>, 119 Nev. 269, 274, 71

P.3d 1264, 1267 (2003).[18]  Del Webb demonstrated a likelihood of success on the merits as these

requirements to the Court's satisfaction in the PIO (Conclusion of Law, No. 60), as shown below:

1.      The Del Webb warranty program is a valid and existing contract between Del

Webb and its homeowner.

2.      Defendants knew of the existence and terms of the Del Webb warranty program as

evidenced by defendants' solicitations of homeowners and from the fact that a copy of the Del

Webb warranty is and was available on Del Webb's website.

3.      Defendants' intentionally acted to disrupt Del Webb's contractual relationship with

its homeowners by making false representations to homeowners of defendants' authority under

Nevada law to perform structural inspections.  Defendants' intent was and is to foster litigation

against Del Webb by which defendants' and the lawyers backing them would gain greatly to Del

Webb's detriment.

4.      The actual disruption of Del Webb's contractual relationships and communications

with its homeowners occurred when the inspections began, all with defendants' goal of fomenting

litigation,[19] which results in the complete cessation of communications between Del Webb and

homeowners, which communications are necessary to the operation of the warranty program.

5.      Del Webb is injured when its communications with homeowners are disrupted and

it is forced to engage in litigation, losing its contractual right to resolve homeowner issues

---

[18]      Defendants' reliance on <u>Bennett</u> is misplaced.  There, the Nevada Supreme Court
held that there was insufficient evidence to support the conclusion that a neighbor had acted with
intend to disrupt a contract to sell land since no motive was shown.  Here, however, defendants'
motive here is clear-- if homeowners keep dealing with Del Webb under their warranties there are
no Chapter 40 cases and without Chapter 40 cases defendants do not recover their millions of
dollars from homeowners.  <u>See</u> email exchanges, Exhibits 23 and 24, *quoted supra*.

[19]      At PIO Conclusion of Law No. 56, this Court concluded that "A demand under
Chapter 40 is the equivalent of a civil action."  This conclusion is well-supported by the text of
NRS 40.600-.688, all of which speak in terms of claims and pleadings.  Moreover, under NRS
40.649, if an insurer is presented with a claim by the builder, the insurer must treat the claim as if

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

23

1    voluntarily, by mediation or arbitration.  Moreover, Del Webb suffers loss to its hard-earned

2    reputation when faced with litigation, even class actions, fomented by illegal, unlicensed

3    solicitations and inspections made by defendants.

4        Defendants' actions suffice to establish intentional interference under their own authority,

5    Ramona Manor Convalescent Hospital v. Care Enterprises, Inc., 325 Cal. Rptr. 120, 126 (Cal.

6    App. 1986) ("Care's decision to hold over beyond the termination of the lease under which it had

7    possession was made with the knowledge that such action would frustrate the legitimate

8    contractual expectations of a specific, albeit unnamed, new lessee").[20]

9

10       The PIO found defendants' activities were intended to interrupt and did interrupt

11   communications between Del Webb and homeowners.  PIO, Finding No. 22.  Injunctive relief is

12   proper to prevent or enjoin future interference with contract relations.  The York Group, Inc. v.

13   Yorktowne Casket, Inc., 924 A.2d 1234, 1242-43 (Pa. Super. 2007) ("the impending loss of a

14   business opportunity or market advantage" is 'irreparable injury' supporting injunctive relief).

15   The threat of continued disruption of customer relations justifies the remedy:

16

17           An injury is regarded as 'irreparable' if it will cause damage which can be
             estimated only by conjecture and not by an accurate pecuniary standard.  Our
18           courts have held … that it is not the initial breach of the covenant which
             necessarily establishes the existence of irreparable harm but rather the unbridled
19           threat of the continuation of the violation, and incumbent disruption of the

20

---

a civil action and been filed and must provide coverage to the extent available under its policy.

[20]     Defendants' other case, National Right to Life Political Action Committee v. Bryan,
741 F.Supp. 807, 814 (D. Nev. 1990), found no intentional interference since the motive to cause a
breach of contract was not demonstrated ("It is the intentional attainment of an unjust advantage
which underlies the requirement that the interference be improper…., and motive or purpose is
usually an accurate measure of the advantage the actor sought and of its just or unjust character.")
Defendants pressured homeowners to sign up with lawyers with whom defendants were associated
and who promised defendants an anticipated pay-day of around $1 million.  Those actions supply
the necessary motive to Del Webb's claim.  See Schiff Depo., Exhibit 15, p. 44, ll. 1-8 (describing
Wilson -- "I still remember the feeling of pressured, slash, badgered.  I really was uncomfortable");
p. 67, ll. 16-17 ("John was very high pressure, very overbearing, made me uncomfortable"); Schiff
Declaration, Exhibit 16, ¶20 ("Mojave's sales tactics and inspections are misleading and deceitful.
…. The… report tries to make it look like it is a really big deal but all the problems we had were
very minor").

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

24

1    employer's customer relations.

2            Thus, the grounds for an injunction are established where the plaintiff's
     proof of injury, although small in monetary terms, foreshadows the disruption of
3    established business relations which would result in incalculable damage should
     the competition continue in violation of the covenant.  The effect of such
4    disruption may manifest itself in a loss of new business not subject to
     documentation, the quantity and quality of which are inherently
5    unascertainable....  Consequently, the impending loss of a business opportunity
     or market advantage also may be aptly characterized as an 'irreparable injury' for
6    purposes of equitable relief.'

7            [T]he impending loss of a business opportunity or market advantage may
     aptly be characterized as an 'irreparable injury' for this purpose, i.e., for the
8    purpose of a preliminary injunction.  [Citation omitted.]

9    Id.

10   **IX.    Del Webb Is Entitled to a Permanent Injunction**

11       Defendants argue that Del Webb has not demonstrated any need for extraordinary

12   injunctive relief.[21]  However, Mr. Wilson testified at his depositions (Exhibit 1, conducted

13   December 1, 2008, and January 6, 2009) that he has continued his inspections through Mr.

14   Franklin's business, including within Sun City Anthem, *after* entry of the PIO.  Defendants'

15   motion is not supported by any contrary evidence, just Mr. Franklin's "expert" opinions that Mr.

16   Wilson's inspection business (as to the profits of which Mr. Franklin has a 25% interest) complies

17   with Nevada law; and Mr. Curtis's opinion that Messrs. Wilson and Partington "are 'contractors'

18   in-fact" who are "exercising their knowledge and 'license' in pursuit of that vocation."

19       A permanent injunction is necessary given the serious harm that has continued and is likely

20   to continue given defendants' cavalier disregard of Nevada statutes and the PIO.  Defendants

21   apparently justify their actions by relying on others with financial interests in their illegal business,

22   such as Mr. Franklin.  There are no equities on defendants' part and a permanent injunction is

23

24

25

26   _____

         [21]    Defendants' reliance on <u>Department of Conservation and Natural Resources, Div.
27   of Water Resources v. Foley</u>, 121 Nev. 77, 109 P.3d 760 (2005), is oddly misplaced.  That case
     discusses a *preliminary* injunction, not a *permanent* injunction, and vacates a preliminary
28   injunction where plaintiffs were not shown to have diligently pursued their water rights.  The case
     is simply not instructive.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

25

1   necessary to protect both Del Webb and the public against defendants' continued illegal business.

2   POM Wonderful LLC v. Purely Juice, Inc., 2008 WL 4222045, *16 (C.D. Cal. 2008) (where the

3   public was deceived into paying for products it believed to be as advertised, permanent injunctive

4   relief was appropriate), citing Kennedy Industries, Inc. v. Aparo, 416 F.Supp.2d 311, 317 (E.D.

5   Pa. 2005) ("There is a strong public interest in preventing false advertising of products in the

6   marketplace"); Resource Lenders, Inc. v. Source Solutions, Inc., 404 F.Supp.2d 1232, 1249, 1250

7   (E.D. Cal. 2005) (public interest served by injunction preventing likelihood of confusion); and

8   Church & Dwight Co., Inc. v. S.C. Johnson & Son, Inc., 873 F.Supp. 893, 912 (D. N.J. 1994)

9

10  (enjoining deceptive advertising because "the public has a right not to be deceived or confused").

11          The protection of the public from unlicensed home inspectors who conduct and make

12  "professional" inspection reports has been recognized by the Nevada legislature as an appropriate

13  government function.  Since 1985, thirty-two states have enacted laws regulating residential

14  inspectors.[22]  To permit unlicensed individuals to conduct illegal inspections would be to permit

15  practices that legislatures have seen fit to prohibit.  See e.g. Brady v. Posse, 2007 WL 519273, *2

16

17  (N.Y. City Civ. Ct. 2007), enforcing New York's inspector licensing laws by rejecting the

18  testimony of an unlicensed inspector in a mold damage case:

19              The statute provides no guidance as to what is the legal effect of a
                purchaser relying on the home inspection report of an unlicensed individual.
20              The above being the case, and *the legislative intent clear that the
                purpose of the licensing statute is to protect the public, the Court cannot*
21              *entertain the witness' testimony* no matter how sincere and accurate it may
                have been.  *To do so would negate the intent of RPL Article 12-b and would*
22              *permit a continuous stream of unlicensed 'home inspectors' to render*
                *opinions, a practice which the legislature has sought to eliminate.*  [Emphasis
23              added.]

24

25          Defendants' continued practice of making illegal inspections and giving legal advice in

26  violation of Nevada law requiring licensing constitutes a nuisance *per se* and is the proper subject

27

28  ────────────────────
    [22]    American Society of Home Inspectors, "Position Statement on Regulation of Home

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

26

1    of a permanent injunction. Gebbie v. Olson, 828 P.2d 1170, 1172 (Wash. App. 1992) (affirming

2    injunction barring an unlicensed person from practicing dentistry: "There is no constitutional right

3    to practice prosthetic dentistry without a license nor is there a constitutional right for patients to

4    obtain prosthetic dental services from unlicensed persons"); id., at 1173 ("engaging in any

5    business or profession in defiance of the law is a nuisance per se and subject to injunction"); and

6
     Marsland v. Pang, 701 P.2d 175, 187 (Haw. 1986) ("Appropriate circumstances to justify
7
     injunctions also exist in the field of professional or occupational licensing statutes.  It is said that
8
9    the statutory requirements are the legislative expressions of the public policy of the state and the

10   operation of such a profession or occupation without a license is per se irreparable injury to that

11   expressed public policy"); Heib v. Arches Financial, 2008 WL 4601602, *4-5 (E.D. Wash. 2008)

12
     (enjoining law offices' unlicensed debt collecting business since it was a per se violation of law
13
14   and "unless enjoined will continue to harm the public interest by causing Plaintiffs and other

15   similarly situated to pay collection charges that are unfair[,] deceptive, unlawful and an unfair

16   method of competition").

17        The misleading solicitations of the unlicensed "expert" defendants fall also within the

18   prohibition of champerty and maintenance and are properly halted by injunctive relief.

19
     Westmoreland County v. Rogers. 693 A.2d 996 (Pa. Cmwlth. 1997) (enjoining consultant engaged
20
21   in champerty and unauthorized practice of law from further soliciting of taxpayers to allow him to

22   pursue tax appeals on their behalf but for his benefit); and Green v. Wyrick, 428 F.Supp. 732 (D.

23   C. Mo. 1976) (enjoining inmate "jailhouse lawyer" from filing future writs on behalf of inmates in

24   order to secure his occasional releases from prison).

25        Finally, proof of actual injury and resulting damages is not a prerequisite to entry of an

26   injunction under the Lanham Act. Southland, supra, 108 F.3d at 1145-46 (the existence of a

27

28   Inspectors" (10/07).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

27

triable issue as to damages does not preclude entry of an injunction); Fortunet, supra, 2008 WL 5083812, *15.  Injunctive relief without reference to impact on the public is appropriate where solicitations are literally false.  Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co., 906 F.Supp. 178, 181 (S.D. N.Y. 1985).

### X.    Defendants' Constitutional Arguments Fail and Have Already Been Rejected

Defendants argue that the First Amendment protects their commercial speech activities, but defendants are not disseminating information or beliefs, but performing residential structural inspections and providing inspection reports in violation of Nevada licensing law for the purpose of fomenting litigation based on their illegal reports.  This conduct is not protected by the First Amendment from regulation, but is the proper subject of a state's reasonable laws to protect the public.  See e.g. defendants' case, Friedman v. Rogers, 440 U.S. 1, 9 (1979), holding that a state's prohibition of the practice of optometry under a trade name was constitutionally permissible in furtherance of protecting the public from deceptive and misleading use of trade names: "Untruthful speech, commercial or otherwise, has never been protected for its own sake."  None of defendants' authorities demonstrates that unlicensed commercial activity is not subject to reasonable state regulation.[23]

Also, NRS Chapter 645D is presumed constitutional and its challenger must prove it unconstitutional beyond reasonable doubt.  Gebbie, supra, 828 P.2d at 1174 (affirming injunction barring unlicensed person from practicing dentistry: "There is no constitutional right to practice

---

[23]    Defendants' case, Va. State Board of Pharmacy v. Va. Citizens Consumer Counsel, 425 U.S. 748 (1976), does not bar state licensing of pharmacists, but prohibits a ban on advertising of prescription medicine prices.  Another of defendants'cases, Kleindienst v. Mandel, 408 U.S. 753 (1972), simply refuses to second guess the Attorney General's executive decision to bar a foreign journalist's entry into the U.S. where the journalist's previous entries ended up being for purposes other than those for which his entry was obtained.  Defendants' reliance on New.Net, Inc. v. Lavasoft, 356 F.Supp.2d 1071 (C.D. Cal. 2003), also fails, refusing to enjoin a company which provided software detection services from informing consumers that plaintiff's surreptitious "foistware" had been loaded onto their computer without their knowledge or consent.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    prosthetic dentistry without a license nor is there a constitutional right for patients to obtain

2    prosthetic dental services from unlicensed persons"); <u>Martinez v. Maruszczak</u>, __ Nev. __, 168

3    P.3d 720, 730 (2007) ("this court presumes that the statute is valid; in order to overcome that

4    presumption, the estate must make a 'clear showing' regarding the statute's invalidity").

5

6    **XI.**    **Defendants Are Not Entitled to Summary Judgment Dismissing Del Webb's Claim for Attorneys Fees as an Element of Substantive Damages**

7        Del Webb's Sixth claim is for attorney fees as substantive damages under <u>Sandy Valley</u>

8    <u>Assoc. v. Sky Ranch Estate Owners Ass'n</u>, 117 Nev. 948, 35 P.3d 964, 969 (Nev. 2001), which

9    holds that a party may claim attorneys fees as special damages in appropriate circumstances, as

10    where it has "incurred attorney fees as foreseeable damages arising from tortious conduct...." <u>See</u>

11    <u>Shalomi v. Western Technologies, Inc.</u>, 2007 WL 1213686, *4 (D. Nev. 2007), *citing* <u>Sandy Valley</u>,

12    35 P.3d at 969, and observing that to recover fees as special damages, they must be "the natural and

13    proximate consequence of the injurious conduct." <u>See also</u> <u>American Monument Foundation, LLC</u>

14    <u>v. Fairbrother</u>, 2006 WL 3063473 (D. Nev. 2006), also *citing* <u>Sandy Valley</u>, 35 P.3d at 969, and

15    declining to grant fees because genuine issues of material fact were unresolved.

16        Del Webb has not sought resolution of its claims for fees by summary judgment. However,

17    if any resolution on the merits of Del Webb's <u>Sandy Valley</u> claim is to be made at this point, it

18    should not be in defendants' favor. Defendants' illegal inspection business was meant to and did

19    foment litigation brought by third parties against Del Webb which required it to seek relief by this

20    case. Del Webb is entitled to recover the fees and costs incurred as a result of defendants' illegal

21    actions under <u>Sandy Valley</u>. Moreover, Del Webb has requested fees under its second and third

22    claims for state and federal deceptive trade practices. <u>See</u> *e.g.* defendants' case, <u>Healthport</u>, *supra*,

23    563 F.Supp.2d at 1183 (the court has authority under the Lanham Act to award fees in

24    circumstances in which the defendant's act is fraudulent, deliberate or willful). Del Webb's

25    measure of recovery under these claims is (1) the fees and costs incurred in defending the illegally-

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

29

1   instituted Chapter 40 proceedings; (2) disgorgement of defendants' profits obtained through their

2   illegal activities at Sun City Anthem, which are anticipated to be over $1 million; and (3) punitive or

3   other statutory damages as appropriate to end defendants' illegal actions.

4       **XII.    Conclusion**

5           Defendants' motion is based on the argument that they can conduct home inspections and

6   communicate home inspection reports without a license under NRS 645D.  Defendants' argument

7   has no good support but arises from the inadmissible conclusions of Mr. Wilson's business partner

8

9   and another "expert" who relies on *Wikipedia* and a New Hampshire newspaper.  The actual

10  language of NRS 645D and its reported legislative history confirm Del Webb's position --

11  defendants' inspection business requires NRS Chapter 645D licensing.  Defendants' argument that

12

13  Nevada no longer prohibits champerty and maintenance is equally defective because an expert

14  cannot instruct the bench on the meaning or applicability of domestic law.

15           Defendants other arguments also fail.  For example, defendants' claim that Del Webb has

16  not proved that defendants engage in interstate commerce is belied by defendants' own testimony

17  proving their use of telephones and the internet in their sales and production and distribution of

18  their reports.  Defendants' free speech arguments are disproved by their own caselaw.

19           This Court rejected defendants' arguments when it granted its PIO enjoining defendants'

20  illegal conduct of business.  Discovery did not improve, but worsened, the facts for defendants.

21  As a result, summary judgment for Del Webb is appropriate under its motion.

22

23                                      LIONEL SAWYER & COLLINS

24                              By _____
                                        Todd M. Touton, Esq.
25                                      1700 Bank of America Plaza
                                        300 South Fourth St.
26                                      Las Vegas, Nevada 89101

27                                      Attorneys for Plaintiff, Del Webb
                                        Communities, Inc.
28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

30

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on the 20ᵗʰ day of March 2009, a true and correct copy of the

3   foregoing PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY

4   JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF ISSUES was

5   served by E-filing to the following:

6
Michael J. Nuñez, Esq.                    Charles Pollock, Esq.

7   Jeremiah Pendleton, Esq.                  LAW OFFICES OF CHARLES M. POLLOCK
MURCHISON & CUMMING, LLP                  10161 Park Run Dr.

8   6900 Westcliff Dr.                        Las Vegas, NV 89145
Suite 605

9   Las Vegas, NV 89145

10                      _Marge Jackson_
An employee of Lionel Sawyer & Collins

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

31

**LIST OF EXHIBITS**

1   Wilson Depositions (12/1/08 and 1/6/09)

2   Emails produced by defendants

3   Diaz Deposition

4   Farruggia Deposition

5   April 10, 1997 Minutes of the Assembly Ways and Means Committee

6   Homeowners' Agreement

7   Defendants' inspection report

8   Partington Deposition

9   MCMC website advertisement (Ex. 19 to Del Webb's motion for preliminary injunction)

10  Reconstruction of placard distribution and Declaration of Kim Roser, Del Webb Litigation Manager

11  Slipock Deposition

12  Dreyer Deposition

13  KVBC report of 9/13/07 (Motion for Preliminary Inj. Ex. 30)

14  KVBC report of 3/15/08 (Motion for Preliminary Inj. Ex. 31)

15  Schiff Deposition

16  Schiff Declaration

17  California and Nevada judicial statistics print-out

18  Kalish Deposition

19  Sample attorney contingency fee agreement

20  Email produced by defendants

21  Email produced by defendants

22  Rosalind Flans Deposition

23  Steven Flans Deposition

24  Marsha Miller Deposition

25  Barry Miller Deposition

26  Barry Miller Declaraton

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

27      Anita Rosen Deposition

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888