1

2

3

4              **UNITED STATES DISTRICT COURT**

5                   **DISTRICT OF NEVADA**

6

7   DEL WEBB COMMUNITIES, INC.,          )
                                         )        2:08-cv-00571-RCJ-GWF
         Plaintiff,                      )
8                                        )
         vs.                             )
9                                        )        **ORDER**
                                         )
10  CHARLES LESLIE PARTINGTON d/b/a       )
    M.C. MOJAVE CONSTRUCTION, JOHN        )
11  WILSON, individually, and DOE         )
    INDIVIDUALS I–X, inclusive; and ROE   )
12  ENTITIES I–X, inclusive,              )
                                         )
13       Defendants.                     )
    _____ )

14          Del Webb Communities builds homes.  Charles Partington and John Wilson operated a

15  business, M.C. Mojave Construction, in which they offered Del Webb's customers free home

16  inspections.  In connection with those inspections, Partington and Wilson provided the homeowners

17  with information about their rights and ability to file complaints for defects in their homes.  This

18  lawsuit arises out of Del Webb's claims against Partington and Wilson for conducting home

19  inspections without a proper license, making false statements of fact in connection with their

20  advertised services, and interfering with the contracts between Del Webb and its customers.  Both

21  parties have filed motions for summary judgment.  (#53, #55).  The Court has considered the

22  motions, briefs, pleadings, and oral argument on behalf of all parties and issues the following order.

23  IT IS HEREBY ORDERED that the Mojave Defendants' Motion for Partial Summary Judgment is

24  DENIED.  (#53).  IT IS FURTHER ORDERED that Del Webb's Motion for Partial Summary

25  Judgment is GRANTED as to the champerty claim but DENIED as to its other claims.  (#55).

## I.      BACKGROUND

Plaintiff Del Webb Communities, Inc. develops residential communities, including master-planned, age-qualified communities in Nevada. (#34, ¶ 10).  In 1998, Del Webb opened Sun City Anthem, an age-restricted community in Clark County, Nevada.  (*Id*. at ¶ 3).  Beginning in 2001, Del Webb offered residents a warranty plan that provided residents with protection for certain structural elements of their homes for up to ten years (the "2001 Del Webb Home Protection Plan"). (*Id*. at ¶ 12).  The 2001 Home Protection Plan also provided that all unresolved disputes between Del Webb and its residents were to be first submitted to mediation.  (*Id*. at ¶ 13).

Defendant Charles Partington began a sole proprietorship called MC Mojave Construction around 1985. (#53, Ex. D, 10:1–9).  Mojave Construction originally limited its operations to doing jobs like room additions and patio covers.  (*Id*.).  Partington conducted such work under a Nevada B-2 contractors license.  (*Id*. at 10:24–11:1).  Over time, Partington expanded the scope of Mojave's operations, constructing tract homes, new homes, and renovating homes and apartment.  (*Id*. at 11:9–11:24).  Beginning around 2006, Mojave added an inspection division that specialized in identifying building violations in homes.  (*Id*. at 11:22–12:10).

Defendant John Wilson was hired to work in Mojave's inspection division.  He was responsible for overseeing the inspections.  (*Id*. at 32:19–33:12; #64, Ex.1, 24:23–25:22).  Prior to working for Mojave, Wilson had been a roofing contractor in California and had supervised home inspections with a company called Construction Design Specialist ("CDS").  (*Id.* at 33:10–13; Ex. E, 21:1–12).

To generate business for the home inspections division, Wilson and other Mojave employees went door-to-door throughout the Sun City Anthem development, soliciting residents' business and leaving fliers advertising their services. (#55, Exs. 19–21).  The fliers informed homeowners that Mojave would provide them a free home inspection to detect any defects in the roofing, concrete, or stucco of their homes.  (*Id*.).  One flier cited Nevada Revised Statute 40.655, informed

homeowners that under that statute they had a right to be reimbursed for costs associated with constructional defects, explained how they could notify their builder (in this case, Del Webb) that Mojave had conducted an inspection of their home and discovered constructional defects, explained how they could assist with a home inspection, and then explained that they could hire a law firm to pursue their Chapter 40 claims. (#1, Ex. 1). Wilson and Partington would provide interested homeowners with a Chapter 40 Inspections and Evaluation Agreement, which explained Mojave's fees for conducting the home inspection and explained that Mojave would receive payment for its services only if the homeowner succeeded in getting reimbursed from the builder, but that even if the homeowner was not successful, that the homeowner agreed to assign his or her right to reimbursement to Mojave. (#1, Ex. 2).

Once an inspection was agreed to, Mojave would leave a placard on or around the property to be inspected, providing information as to the impending inspections. (#1, Ex. 3). One law firm with which Wilson and Partington worked with in connection with legal representation of homeowners for their Chapter 40 claims was Angius & Terry. (#55, Ex. 40). Angius & Terry's retainer letter stated that if the client ended Angius & Terry's representation, but recovered from the builder, the client would be responsible to pay all fees and costs associated with the litigation. (*Id.*).

Del Webb has instituted the present lawsuit to challenge the activities of Partington and Wilson (collectively, the "Mojave Defendants") in connection with the Mojave home inspection business. In May 2008, Del Webb filed this lawsuit with the following claims against the Mojave Defendants: (1) champerty and maintenance; (2) violation of Nevada's Deceptive Trade Practices Act; (3) violation of the Lanham Act for false advertising; (4) intentional interference with contractual relationships; and (5) attorneys' fees. (#1). In October 2008, this Court granted a preliminary injunction against the Mojave Defendants, prohibiting them from performing home inspections or soliciting any business related thereto. (#34). The Mojave Defendants and Del Webb have now moved for summary judgment as to all or part of Del Webb's claims. (#53, #55).

## II.      LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *See id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp.,* 477 U.S. at 323–24 (1986).

In a summary judgment posture, the Court must consider the parties' respective burdens.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *See Celotex Corp.,* 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita*

1   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2   To establish the existence of a factual dispute, the opposing party need not establish a material issue

3   of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require

4   a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc.*

5   *v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).   In other words, the

6   nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that

7   are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead,

8   the opposition must go beyond the assertions and allegations of the pleadings and set forth specific

9   facts by producing competent evidence that shows a genuine issue for trial.  *See* Fed. R. Civ. P.

10   56(e); *see also, Celotex Corp.*, 477 U.S. at 324.

11   When considering a summary judgment motion, the Court examines the pleadings,

12   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

13   Fed. R. Civ. P. 56(c).  At summary judgment, the judge's function is not to weigh the evidence and

14   determine the truth but to determine whether there is a genuine issue for trial.  *See Anderson*, 477

15   U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to

16   be drawn in his favor."  *Id.* at 255.  But, if the evidence of the nonmoving party is merely colorable

17   or is not significantly probative, summary judgment may be granted.  *See id.* at 249–50.

18   **ANALYSIS**

19   **III.   MAINTENANCE AND CHAMPERTY**

20   Both parties have moved for summary judgment as to Del Webb's claims for maintenance

21   and champerty.

22   Maintenance and champerty are closely related common law doctrines.  Maintenance "is

23   officious intermeddling in a suit which in no way belongs to the intermeddler, by maintaining or

24   assisting either party to the action, with money or otherwise, to prosecute or defend it."  14 AM. JUR.

25   2d *Champerty, Maintenance, and Barratry* § 1 (2000).  Champerty is a species of maintenance "in

1   which the intermeddler makes a bargain with one of the parties to the action to be compensated out

2   of the proceeds of the action." *Id*.  The United States Supreme Court has said, "[p]ut simply,

3   maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a

4   financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty."

5   *In re Primus*, 436 U.S. 412, 424 n. 15, 98 S.Ct. 1893, 1900 n. 15, 56 L.Ed.2d 417, 429 n. 15 (1978).

6        The doctrines of champerty and maintenance originated in medieval England.  *Osprey, Inc.*

7   *v. Cabana Ltd. Partnership*, 340 S.C. 367, 532 S.E.2d 269 (S.C. 2000).  In medieval England, feudal

8   lords and other privileged society members would often assist others, usually those of little means,

9   by supporting the unprivileged's legal disputes against a third party, often the wealthy citizen's

10   personal or political enemy.  *Id*. at 374–75.  In return for funding the lawsuit, the party to whom the

11   claim actually belonged promised to give his or her benefactor a stake in the outcome of the lawsuit.

12   *Id*. By such practices, the wealthier actually became wealthier.  "Champerty was a 'means by which

13   powerful men aggrandized their estates and the background was unquestionably that of private

14   war.'"  *Id*. at 375 (quoting Max Radin, Maintenance by Champerty, 24 Cal.L.Rev. 48, 58–64

15   (1935)).  In response to rampant champerty and maintenance in feudal society, the law came to

16   sternly prohibit these practices.  *Id.* at 375–76.

17        Some states have outrightly abolished these ancient doctrines.  In *Saladini v. Righellis*, the

18   Massachusetts Supreme Court held that champerty and maintenance would no longer be recognized

19   in the state.  687 N.E.2d 1224, 1226 (Mass. 1997).  In *Saladini*, Saladini and Righellis executed an

20   agreement under which Saladini agreed to fund Righellis's potential lawsuit.  In return, Righellis

21   agreed that if Righellis was successful in his lawsuit, he would first reimburse Saladini and then give

22   Saladini 50% of the recovery left over after attorneys' fees.  *Id*. at 1234–35.  The Massachusetts

23   Supreme Court concluded that the agreement was champertous, but declined to declare the

24   agreement void under the doctrine of champerty.  As to whether Massachusetts would continue to

25   recognize the doctrine in any case, the court held:

> We also no longer are persuaded that the champerty doctrine is needed to protect against the evils once feared: speculation in lawsuits, the bringing of frivolous lawsuits, or financial overreaching by a party of superior bargaining position. There are now other devices that more effectively accomplish these ends.

*Id*. at 1226.  The Court ultimately determined that in the future, the legal analysis would turn on whether the fees charged were excessive or "overreaching," not whether the agreement was void under champerty.  *Id*. at 1227.  *See also*, *Osprey, Inc.,* 532 S.E.2d at 279 (abolition by South Carolina Supreme Court, concluding that "[w]e abolish champerty as a defense because we believe it no longer is required to prevent the evils traditionally associated with the doctrine as it developed in medieval times.").

Nevertheless, Nevada still recognizes maintenance and champerty.  For purposes of these summary judgment motions, the Court limits its analysis to champerty.  Champerty and maintenance are closely related, but there is a crucial distinction between the two:  the offense of champerty differs from maintenance in that in the latter, the person assisting the suitor receives no benefit, while in the former, he receives some stake in the lawsuit.  Here, Del Webb is basing its claim on the Mojave Defendants' efforts to promote the Chapter 40 complaints against Del Webb with the agreement that the Mojave Defendants would be reimbursed from the recovery.  Therefore, although Del Webb characterizes its claim as one for champerty *and* maintenance, the claim is more appropriately limited to champerty.

Nevada recognizes the common law doctrine of champerty.  In *Schwartz v. Eliades*, Schwartz, Eliades, and four other individuals with ownership interests in Checker Cab Company of Nevada, Inc. ("Checker Cab") and Yellow Cab Company of Nevada, Inc. ("Yellow Cab") filed a defamation lawsuit. 113 Nev. 586, 588, 939 P.2d 1034 (Nev. 1997).  During the litigation, Schwartz executed documents with Checker Cab and Yellow Cab in which Schwartz undertook all liability for past and future expenses related to the litigation and would receive all proceeds, if any, from the litigation.  *Id*.  Later on Schwartz and Eliades entered a contractual agreement in which Eliades

1   would be entitled to one-half of any proceeds from the litigation in exchange for paying Schwartz

2   $187,421.50 plus one-half of any costs related to the litigation due and one-half of any costs incurred

3   in the future. *Id.* They lost the defamation lawsuit and Schwartz sought to recover the money that

4   Eliades promised to pay him under their agreement, but Eliades refused to pay. As a result,

5   Schwartz sued for breach of contract.

6        The district court ruled in favor of Eliades, holding the agreement between him and Schwartz

7   to be unenforceable under the doctrine of champerty. *Id.* at 589. The decision was appealed to the

8   Nevada Supreme Court. The court summarized the doctrine of champerty, acknowledging it as valid

9   under Nevada law. *Id*. at 589–90. Nevertheless, the court concluded that Eliades still had an interest

10   in the Checker Cab and Yellow Cab companies when he executed the agreement with Schwartz.

11   As a result, Eliades was not a "stranger to the lawsuit" and could not be charged with entering a

12   champertous agreement. *Id*. at 591. The *Schwartz v. Eliades* decision illustrates that champerty is

13   a viable doctrine under Nevada law.

14        Champerty is "intended to prevent the interference of strangers having no pretense of right

15   to the subject of the suit, and standing in no relation of duty to the suitor." *Smith v. Hartsell*, 150

16   N.C. 71, 78–79, 63 S.E. 172 (1908) (citation omitted). There are three basic elements of a

17   champerty claim. First, the party involved must be one who has no legitimate interest in the suit.

18   Second, the party must expend its own money in prosecuting the suit. Third, the party must be

19   entitled by the bargain to share in the proceeds of the suit. In this case, the Mojave Defendants had

20   no interest in any lawsuit or similar proceeding between Del Webb and its homeowners. Del Webb

21   already provided its homeowners protection for certain defects in their homes, which the

22   homeowners needed to seek from Del Webb under the 2001 Del Webb Home Protection Plan. The

23   Mojave Defendants expended their own money in instigating the complaints against Del Webb. The

24   Mojave Defendants expended their time, money, and resources to provide the home inspections and

25   related reports that were necessary to file the complaints. The Mojave Defendants did not charge

1   the homeowners up front, but they ultimately required them to pay the Mojave Defendants from the

2   proceeds that the homeowners got from Del Webb.   Under the agreements that the Mojave

3   Defendants had the homeowners sign, the Mojave Defendants were entitled to be reimbursed for the

4   home inspections they performed or to the assignment of the homeowners' right against Del Webb

5   so that the Mojave Defendants could collect their fees directly from Del Webb.  The situation in this

6   case is particularly problematic because the Mojave Defendants did not just offer a free home

7   inspection, but they informed homeowners of how they could file complaints against Del Webb

8   under Nevada law, the role of the home inspection in filing such complaints, and how they should

9   go about hiring a law firm to assist with filing the complaint.  As a result, the Mojave Defendants

10  are liable for champerty in this case.

11      As an evidentiary matter, Del Webb has properly opposed the admission of or this Court's

12  consideration on summary judgment of the expert declaration by California attorney, Robert Kehr.

13  Mr. Kehr has provided a declaration on his opinion of the doctrine of champerty.  Federal Rule of

14  Evidence 702 ("Rule 702") governs the admissibility of expert testimony, which states in full:

15      If scientific, technical, or other specialized knowledge will assist the trier of fact to
        understand the evidence or to determine a fact in issue, a witness qualified as an
16      expert by knowledge, skill, experience, training, or education, may testify thereto in
        the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
17      facts or data, (2) the testimony is the product of reliable principles and methods, and
        (3) the witness has applied the principles and methods reliably to the facts of the
18      case.

19      In general, Rule 702 is viewed as requiring the trial judge to ensure that proffered expert

20  testimony is both reliable and relevant. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct.

21  1167, 1174 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589-90, 113 S.Ct.

22  2786, 2795, (1993)).

23      Mr. Kehr's opinions simply define the common law doctrines of champerty and maintenance,

24  summarize the treatment of these doctrines by the courts of this country, and conclude that the Court

25  cannot recognize any affirmative cause of action under these doctrines.  One type of expert

1   testimony courts are consistently reluctant to admit is an expert's opinions of law.  *See*, *e.g.*,

2   *Mendenhall v. Cedarapids, Inc*., 5 F.3d 1557, 1574 (Fed. Cir. 1993); *Burkhart v. Washington Metro.*

3   *Area Transit Auth*., 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("an expert may offer his opinion as to

4   facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he

5   may not testify as to whether the legal standard has been satisfied"); *United States v. Duncan*, 42

6   F.3d 97, 101 (2d Cir. 1994).  As the D.C. Circuit once aptly noted, "[e]ach courtroom comes

7   equipped with a 'legal expert,' called a judge." *Burkhart*, 112 F.3d at 1213.  Rule of Evidence 704

8   ("Rule 704") allows expert testimony on an ultimate issue, but that does not mean an expert may

9   advise the court on purely legal issues.  Mr. Kehr's opinions are purely on legal issues.  As a result,

10   the Court holds that Mr. Kehr's opinions are inadmissible under Rule 702 and cannot be considered

11   by this Court on summary judgment.  *See Ballen v. City of Redmond*, 466 F .3d 736, 745 (9th Cir.

12   2006) (court "may only consider admissible evidence in ruling on a motion for summary

13   judgment.").

14        For these reasons, the Court DENIES the Mojave Defendants' Motion for Summary

15   Judgment as to Del Webb's first cause of action and GRANTS Del Webb's Motion for Partial

16   Summary Judgment as to its champerty claim.

17   **IV.   THE NDTPA**

18        NRS 41.600 states that "[a]n action may be brought by any person who is a victim of

19   consumer fraud."  NRS 41.600(1).  Chapter 41.600(2)(e) defines "consumer fraud" to include "[a]

20   deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."  If the claimant

21   prevails, he is entitled to recover "[a]ny damages that he has sustained," as well as costs and

22   attorneys' fees.  *Id.* at 41.600(3).  The Nevada Deceptive Trade Practices Act ("NDTPA"), NRS

23   598.0915 *et seq*., defines a "deceptive trade practice" as "when in the course of his business or

24   occupation he knowingly . . . [c]onducts the business or occupation without all required state, county

25   or city licenses."  NRS 598.0923(1).

1    The consumer fraud and deceptive trade practice at issue here is grounded in the Mojave

2  Defendants' failure to secure a license under NRS 645D.  The Mojave Defendants argue that they

3  operated their home inspections division under Partington's general contractor's license, which they

4  argue was sufficient for their inspection services.  The Court must determine whether Nevada's

5  statutory scheme requires contractors who perform home inspections, like the ones performed by

6  the Mojave Defendants, to be licensed pursuant to NRS 645D.  Both parties have moved for

7  summary judgment on this issue.

8    Chapter 645D governs inspections of structures.  Chapter 645D.080 defines "inspector" as

9  "a person who examines any component of a structure and prepares or communicates an inspection

10  report."  Chapter 645D.060 defines "inspection" as "a physical examination of the mechanical,

11  electrical or plumbing systems of a structure or of the structural components of a structure," which

12  includes "any consultation regarding a structure that is represented to be a certified inspection or any

13  other title, word or other designation intended to imply or designate that the consultation is a

14  certified inspection."  Chapter 645D.070 defines "inspection report" as the following:

15    Inspection report" means an analysis, opinion or conclusion, regarding the condition
     of a structure, that is:
16

17    1. Provided after an inspection, in a written report, for or with the expectation of
     receiving compensation for the report; and

18    2. Designed to describe and identify the inspected systems or structural components
     of the structure, their physical condition, any material defect and any
19    recommendation for evaluation by another person.

20  NRS 645D.160 mandates that "[a]ny person who, in this state, engages in the business of, acts in the

21  capacity of, or advertises or assumes to act as an inspector" obtain a certificate or license pursuant

22  to chapter 645D. Chapter 645D provides numerous educational requirements and other professional

23  standards for one to be licensed or certified to conduct inspections.  See NRS 645D.180(1); NRS

24  645.180(2); NRS 645D.190; NRS 645D.195; NAC 645D.210; NAC 645D.460.  The Real Estate

25

1   Division of the Department of Business and Industry is responsible for administering the licensing

2   or certification of inspectors.  NRS 645D.050; NRS 645D.110.

3   　　　The Mojave Defendants argue that NRS 645D is a *certification* scheme rather than a

4   *licensing* scheme and that acting without a *certificate* does not come within the purview of NRS

5   598.0923.1, which uses the word *license*.  The Mojave Defendants provide no authoritative

6   argument for treating these two terms differently.  In fact, NRS 645D uses the terms "license,"

7   "certificate," and "registration" interchangeably.  *See, e.g.*, NRS 645D.900.  This argument is

8   without merit.

9   　　　More importantly, the Mojave Defendants argue that they did not need to have a NRS 645D

10  license to conduct their home inspection activities.  According to them, NRS 645D and NAC 645D

11  are narrowly tailored to licensing individuals to conduct home inspections prepared in advance of

12  real estate sales.  They argue that because their inspections were not conducted in conjunction with

13  the sale of a home and were only done to gauge compliance with building code violations, they were

14  not required to be licensed under NRS 645D.

15  　　　The Mojave Defendants' argument is principally based on the expert opinions of Mr. Glen

16  Curtis, a certified master inspector in the State of Nevada, and Mr. Richard Franklin, a construction

17  consultant and a licensed general contractor.  Their reports discuss the history and purpose of NRS

18  645D, opine that those certified under NRS 645D do not have the qualifications for and do not as

19  a matter of custom do the kind of home inspections performed by the Mojave Defendants. (#53, Ex.

20  C).  For the same reasons explained above in connection with considering Mr. Kehr's expert

21  opinions under Rule 702, the Court cannot consider the expert opinions of Mr. Franklin and Mr.

22  Curtis.  The Court's sole job here is one of law: the Court must interpret NRS 645D and draw a legal

23  conclusion as to whether those who conduct home inspections, like those conducted by the Mojave

24  Defendants, are required to be licensed under NRS 645D.  Mr. Franklin and Mr. Curtis are not

25  trained in the law; so their opinions as to the meaning, purpose, history, and scope of NRS 645D are

1    inadmissible.  The Court needs to be the legal expert as to Nevada law and determine the meaning

2    of NRS 645D.

3         The Nevada courts have not construed NRS 645D.  "Where the state's highest court has not

4    decided an issue, the task of the federal courts is to predict how the state high court would resolve

5    it."  *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007) (quotation marks

6    omitted).  "In answering that question, this court looks for 'guidance' to decisions by intermediate

7    appellate courts of the state and by courts in other jurisdictions."  *Id.* (quotation marks omitted).  The

8    Court looks to Nevada rules of statutory interpretation to determine the meaning of a Nevada statute.

9    *See In re First T.D. & Inv., Inc.*, 253 F.3d 520, 527 (9th Cir. 2001).

10        The Court begins with the statute's plain language.  *Washoe Med. Ctr. v. Second Judicial*

11   *Dist. Court*, 122 Nev. 1298, 148 P.3d 790, 793 (Nev. 2006) (en banc).  If the statute is unambiguous

12   on its face, then the Court does not go beyond the statute's language.  *Id.*  The Court concludes that

13   the statute's language is unambiguous.  The statute states that if an individual conducts "a physical

14   examination of the mechanical, electrical or plumbing systems of a structure or of the structural

15   components of a structure" and issues "an analysis, opinion or conclusion, regarding the condition

16   of a structure, that is (1) [p]rovided after an inspection, in a written report, for or with the

17   expectation of receiving compensation for the report; and (2) [d]esigned to describe and identify the

18   inspected systems or structural components of the structure, their physical condition, any material

19   defect and any recommendation for evaluation by another person," that individual is required to be

20   licensed or certified under NRS 645D.  The Mojave Defendants do not dispute that the term

21   "structure" reaches homes, but they contend it only reaches home inspections done in connection

22   with the sale of a home.  The text does not support this distinction.  The text draws no line in the

23   sand between an inspection done with the sale of a home from any other home inspection.

24        Furthermore, chapter 645D actually lists several categories of people to whom chapter 645D

25   does not apply, but there is no indication that those exceptions reach the Mojave Defendants.  NRS

1   645D.100. Under the statutory canon of *expressio unius est exclusio alterius*, "the expression of one

2   thing implies the exclusion of another." *Ayes v. U.S. Dept. of Veterans Affairs*, 473 F.3d 104,

3   110–11 (4th Cir. 2006). Under this canon, chapter 645D's articulation of eight specifically defined

4   exceptions to chapter 645D's certification implies the exclusion of other possible categories of

5   individuals excluded from its requirements. There is no indication in the language of NRS 645D

6   that the Nevada legislature intended to bifurcate the licensing requirements for those inspecting

7   homes between those who did it for a home being sold and all other homes. Had the Nevada

8   legislature intended to create such an exception, it could have done so by expanding its exceptions.

9       To the extent there is an ambiguity in NRS 645D, legislative intent is controlling. *Washoe*

10  *Med. Ctr.*, 148 P.3d at 793. The legislative history of NRS 645D showers significant light on the

11  Court's position as to the plain meaning of the statute. The sponsor of the bill, Assemblyman Bernie

12  Anderson, described the mischief that gave rise to the bill that became NRS 645D as being "the fact

13  that in the construction world there were people who offered themselves as building inspectors who

14  in fact did not meet any type of criteria in terms of testing or certification." (#64, Ex. 5). As a

15  result, "the unsuspecting homeowner subscribed to a program that ultimately may or may not give

16  them a proper inspection of their property." (*Id.*). In fact, the legislative history expressly refutes

17  the Mojave Defendants' claim that a general contractors license should suffice to conduct home

18  inspections. Assemblyman Anderson "stated that because someone was a contractor he was not

19  necessarily qualified to be a home inspector. A home inspector required a different level of criteria

20  than to simply meet the requirements of a contractor." (*Id.*). In sum, state legislators intended on

21  protecting homeowners—all homeowners. The legislative history did not stress the inspections of

22  homes done at the time the homes are sold. It simply focused on protecting homeowners by

23  ensuring that anyone who inspects their home meets certain requirements. The law would "give a

24  standard for anyone in that profession and enable the homeowner to rely upon the fact that the state

25  had indeed screened someone before he offered his services." (*Id.*). Therefore, the legislative

1  history supports the Court's interpretation of the statute's plain language that the Mojave Defendants

2  were required to secure licenses under NRS 645D to conduct home inspections in connection with

3  their business.

4  In light of the plain language and legislative history, the Court concludes that NRS 645D

5  does require a license to conduct a home inspection like the ones done by the Mojave Defendants.

6  This conclusion is consistent with "the policy and spirit of the law" and does not lead to "an absurd

7  result." *Washoe Med. Ctr.*, 148 P.3d at 793.  As a result, the Mojave Defendants engaged in a

8  deceptive trade practice and consumer fraud as defined under NRS 41.600 and NRS 598.0923(1)

9  by knowingly conducting their home inspections business without the required license.

10  The Mojave Defendants argue that only the Nevada Real Estate Division and Nevada

11  Consumer Affairs Division have the right to enforce NRS 645D and that Del Webb has no standing

12  to pursue the present cause of action against the Mojave Defendants.  This argument must fail in

13  light of the plain language of NRS 41.600. Nevada Revised Statute Chapter 598 "generally provides

14  for a public cause of action for deceptive trade practices." *Nev. Power Co. v. Eighth Judicial Dist.*

15  *Court of Nev.*, 102 P.3d 578, 583 n.7 (Nev. 2004).  However, NRS 41.600 provides that a victim of

16  "consumer fraud" may assert a private cause of action.  *Id.*  Consumer fraud includes "[a] deceptive

17  trade practice as defined in NRS 598.0915 to 598.0925, inclusive." *Id.* (quoting NRS 41.600(2)(d)).

18  The Mojave Defendants further argue that Del Webb cannot sue under the NDTPA because

19  Del Webb was not the actual victim of the Mojave Defendants' alleged consumer fraud. NRS 41.600

20  requires that, at a minimum, a victim of consumer fraud prove that (1) an act of consumer fraud by

21  the defendant (2) caused (3) damage to the plaintiff.  *Picus v. Wal-Mart Stores, Inc.*, Nos.

22  2:07-CV-00682, 2:07-CV-00686, and 2:07-CV-00689, 2009 WL 667419, at *6 (D.Nev. Mar. 16,

23  2009).  Of course, a threshold inquiry is whether Del Webb constitutes "a victim" within the

24  meaning of § 41.600.  The term "victim" in § 41.600 is not defined, and the Nevada Supreme Court

25  has not furnished any definition.

1   The Mojave Defendants argue that a third party business cannot be a "victim" under §

2   41.600.  The Court disagrees.  NRS 598.0953(1) states that "[e]vidence that a person has engaged

3   in a deceptive trade practice is prima facie evidence of intent to injure *competitors* and to destroy

4   or substantially lessen competition."  As one judge in this district has already concluded, "[b]y

5   creating a presumption that deceptive trade practices harm competitors, then making those same

6   deceptive trade practices into acts of consumer fraud, the Nevada legislature impliedly defines

7   competitors harmed by deceptive trade practices as victims of consumer fraud." *Southern Service*

8   *Corp. v. Excel Bldg. Services, Inc.*, No. 03:05-CV-0297, 2007 WL 2325203, at *2 (D. Nev. Aug. 13,

9   2007) (Hicks, J.).  Del Webb provided warranties to its buyers under which Del Webb promised

10   remedies for certain structural defects in the homes it sold.  Under the 2001 Del Webb Home

11   Protection Plan, upon receiving a notice or complaint of a defect that fell within the scope of the

12   Plan, Del Webb would have inspected the home and repaired the defect.  By offering its own free

13   home inspections to detect defects, the Mojave Defendants put themselves in a competitive posture

14   vis-a-vis Del Webb.  As a result, Del Webb has justified its position as a victim of the Mojave

15   Defendants' alleged consumer fraud.

16   Even if Del Webb is not a per se competitor with the Mojave Defendants, Del Webb still

17   qualifies as a victim.  When the Mojave Defendants went door-to-door throughout Del Webb's large

18   residential neighborhood and solicited business, they were suggesting, if not encouraging, the

19   residents to file a lawsuit or Chapter 40 complaint against the builder, which in this case was Del

20   Webb.  The Mojave Defendants should have known that their practices were inevitably going to be

21   adverse to Del Webb.

22   Del Webb has satisfied the first element, for the reasons explained above, by establishing that

23   the Mojave Defendants engaged in consumer fraud.  The problem for Del Webb is that it needs to

24   prove that the Mojave Defendants' consumer fraud or deceptive trade practices caused damage to

25   Del Webb.  In addition to allowing one to recover his or her costs and attorneys' fees associated with

1   a lawsuit under NRS 41.600, the statute allows only one type of monetary relief—damages that he

2   or she has sustained.

3       Del Webb argues in a conclusory manner that this deceptive conduct "harmed Del Webb by

4   causing the disruption of Del Webb's relationship with its homeowners in general and under

5   warranty programs."  (#55 at 24; #64 at 15).  Del Webb has produced deposition testimony that

6   certain homeowners did rely upon the Mojave Defendants' misrepresentations that they were

7   licensed or working in conjunction with Del Webb to allow the Mojave Defendants to conduct the

8   inspections.  As a result of allowing those inspections and initiating Chapter 40 claims against Del

9   Webb, Del Webb has shown that their customers put themselves in breach of their warranties with

10  Del Webb, precluding Del Webb from communicating with them or being able to repair their

11  customer's homes under the warranties.  (#64, Ex. 22, 82:22–25; Ex. 23, 83: 8–24; Ex. 24, 47: 7–15;

12  Ex. 25, 49: 2–5).  Such evidence creates a genuine issue of material fact that the Mojave Defendants'

13  deceptive trade practices caused Del Webb to sustain damages in response to the Mojave

14  Defendants' summary judgment motion, but such evidence is not sufficient to grant Del Webb a

15  summary judgment motion.  Del Webb has not carried its own burden on its summary judgment

16  motion that it has actually sustained damages from the Mojave Defendants' deceptive trade

17  practices.

18      In light of the foregoing, the Court DENIES the summary judgment motions presented by

19  both Del Webb and the Mojave Defendants as to this cause of action.  There is no genuine issue of

20  material fact that the Mojave Defendants engaged in deceptive trade practices or that those practices

21  adversely impacted the relationship between Del Webb and its homeowners.  Yet, the record does

22  not make clear how and to what extent those practices and disruptions actually damaged Del Webb.

23  **V.   THE LANHAM ACT**

24      To establish a false advertising claim under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)),

25  a plaintiff must show:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997) (footnote omitted).

Del Webb argues that the Mojave Defendants made three false statements in connection with the advertisement of their home inspection services. First, Del Webb argues that the Mojave Defendants advertised that the home inspections that they provided were free to home owners when in fact, they were not. Second, Del Webb contends that the Mojave Defendants represented that they were licensed to perform the advertised home inspections when in fact, they were not. Third, Del Webb argues that the Mojave Defendants falsely represented that they were performing their home inspection services in collaboration with Del Webb. Both parties have moved for summary judgment on this claim.

### A. Competitive Injury

As a threshold matter, the Mojave Defendants argue that Del Webb cannot sue the Mojave Defendants for false advertising because they are not competitors. For false advertising, "[r]epresentations constitute commercial advertising or promotion under the Lanham Act if they are 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing consumers to buy defendant's goods or services." *See Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003).

The Mojave Defendants misconstrue what the Ninth Circuit requires for proof related to "commercial competition." In *Coastal Abstract Services v. First American Title Ins. Co.*, for example, the Ninth Circuit rejected an argument by the defendant, a title insurance company, that it was not in commercial competition with the plaintiff, an escrow agent, for purposes of the plaintiff's Lanham Act claim. 173 F.3d 725, 730 (9th Cir. 1999). In *Coastal Abstract*, an officer

1  of the defendant title company, First American, argued that he could not be liable "under the
2  Lanham Act because he, as an individual, is not in competition with Coastal," the plaintiff escrow
3  agency. *Id*. at 734. The Court found that the defendant corporation's officer could be liable under
4  the Lanham Act because he "sought by his statements to divert business from Coastal to First
5  American," thereby causing plaintiff a competitive injury. *Id*. The court declined to focus on
6  whether parties were "in competition," stating that "the crux of [the Ninth Circuit's seminal case on
7  the competitive injury requirement] was that the victim . . . had not suffered *a competitive injury*."
8  *Id*. at 725 (emphasis added).

9      *Coastal Abstract* illustrates that a "competitive injury," rather than an exact identity between
10  the businesses of the plaintiff and defendant, is the key to standing on a Lanham Act false
11  advertising claim. In *Coastal Abstract*, the Ninth Circuit did not focus on whether the parties were
12  for profit or non-profit entities, or on the structure of their businesses, but on whether the statements
13  in issue tended to divert business from the plaintiff to the defendant. The first problem with the
14  Mojave Defendants' argument is that their home inspection services were one part of their business.
15  It was not their entire business. Mojave Construction originally limited its operations to doing jobs
16  like room additions and patio covers, but expanded its business to constructing tract homes, new
17  homes, and renovating homes and apartment. (#53, Ex. D, 11:9–11:24). In 2006, it began the home
18  inspection division, but there is no evidence that they ceased their prior operations related to
19  constructing and renovating homes. As a result, Mojave Construction did directly compete with Del
20  Webb.

21      Furthermore, even if the Mojave Construction business was limited to home inspections,
22  false advertisements about the home inspection business could have inflicted a competitive injury
23  upon Del Webb. Del Webb had warranties with its homeowners. Pursuant to those warranties, the
24  homeowners were supposed to contact Del Webb and Del Webb would be entitled to inspect the
25  claim and repair it if necessary. This was part of Del Webb's business. By making false

1   representations about their home inspection services and conducting such inspections, the Mojave

2   Defendants were doing something that Del Webb was entitled to do pursuant to its warranties with

3   its buyers.  Therefore, the Mojave Defendants were diverting Del Webb's customers away from Del

4   Webb.  Also, to the extent the Mojave Defendants were finding and reporting defects that were

5   either trivial or non-existent, the Mojave Defendants could have injured Del Webb's reputation and

6   taken future business away from them.

7        Based upon the foregoing, the Court finds that Del Webb has established a competitive injury

8   and standing for its false advertising claim.

9        **B.**    **Falsity of Statements**

10      Falsity under the Lanham Act includes statements that are literally false, either on their face

11   or by necessary implication, or statements that are literally true but likely to mislead or confuse

12   consumers.  *Id*.  "Where a statement is not literally false and is only misleading in context . . . proof

13   that the advertising actually conveyed the implied message and thereby deceived a significant

14   portion of the recipients becomes critical."  *William H. Morris Co. v. Group W, Inc*., 66 F.3d 255,

15   258 (9th Cir. 1995).  However, where a defendant intentionally misled consumers or the

16   advertisement is literally false, a presumption arises that consumers were in fact deceived and the

17   burden shifts to the defendant to prove otherwise.  *Time Warner Cable, Inc. v. DIRECTV, Inc*., 497

18   F.3d 144, 153 (2d Cir. 2007); *William H. Morris Co.*, 66 F.3d at 258.

19        In this case, Del Webb is arguing that the Mojave Defendants' actionable statements were

20   literally false, thus triggering a presumption that consumers were in fact deceived.  The first alleged

21   misrepresentation deals with the Mojave Defendants' advertisement of "free" home inspection

22   services. The Mojave Defendants clearly advertised that their home inspection services were "free."

23   (#55, Exs. 19–21).  Yet, other forms that the Mojave Defendants prepared for consumers or had

24   consumers sign included other statements discussing the cost of the home inspection services,

25   thereby serving as evidence that the other statements about the "free" home services were literally

1   false.  The Chapter 40 notices that the Mojave Defendants had consumers submit to Del Webb

2   notified Del Webb of the "expense" that the consumers had incurred by having the Mojave

3   Defendants inspect their home. (#55, Exs. 26–30).  The Mojave Defendants' Chapter 40 Inspections

4   and Evaluation Agreement with homeowners explained the description and "cost" of their home

5   inspection services.  (*Id.*, Ex. 34).  The Agreement specified that the Mojave Defendants would

6   collect such fees if the builder reimbursed the homeowner.  (*Id.*).

7        The Mojave Defendants argue that such an arrangement shows that the inspections were free

8   to the homeowners.  But if homeowners took the time and resources to pursue a Chapter 40

9   complaint and actually recovered, such conduct itself was a cost to them and they were then required

10  to apportion part of their recovery to pay the Mojave Defendants.  In fact, knowing that they would

11  have to pay the Mojave Defendants would likely affect the amount that homeowners would settle

12  for in the end.  In short, the evaluation was not "free" to homeowners.  Something is free when

13  nothing is received in return.  The Mojave Defendants required payment if the homeowners

14  recovered, and even if the homeowners did not recover, the Agreement required them to assign their

15  right to recover to the Mojave Defendants.  In light of the foregoing, the Mojave Defendants made

16  false statements of fact about their commercial home inspection services.

17       The second misrepresentation of fact deals with the Mojave Defendants advertising that they

18  were authorized and licensed to perform the advertised home inspections, when in fact, they were

19  not.  For the reasons explained in the prior section, this Court concludes that the Mojave Defendants

20  did not have the required license under NRS 645D.  By advertising their home inspection services,

21  by necessary implication, they were advertising that they were licensed to do so.  Moreover, Del

22  Webb has produced deposition testimony from homeowners that the Mojave Defendants or their

23  agents represented that they were properly licensed to conduct the home inspections and that they

24  relied upon these representations. (#55, Ex. 14, Deposition of Mary McCullough, 28:8–10; Ex. 12,

25

1  Deposition of Leonard Eposito, 29: 3–5).  As a result, they made false representations of fact about

2  their authority to conduct their commercial home inspection services.

3           The third misrepresentation relates to advertising that Del Webb was associated with the

4  Mojave Defendants or sponsoring the home inspections.  The main example of this representation

5  was on placards that the Mojave Defendants left at homes after an agreement was made to have the

6  Mojave Defendants conduct their inspections.  The placard stated:

7               As a courtesy, we are informing you that, due to a "Builder" home inspection, you
           may experience a few hours of extra vehicular traffic in your neighborhood.  These
8               vehicles belong to representative & experts from both MC Mojave Construction &
           your Builder, his subcontractors and agents.
9

10  (#1, Ex. 3).  This issue is not as clear cut as the two misrepresentations discussed above.  A

11  "builder's inspection" could refer to a generic home inspection designed to determine if the builder

12  complied with the necessary local building codes.  Alternatively, a "builder's inspection" could

13  mean an inspection conducted or sponsored by the actual builder, in this case Del Webb.  Such an

14  interpretation of the placard's message is somewhat bolstered by the message capitalizing the term

15  "Builder," as if it was referring to a specific builder.  Del Webb has cited to one deposition where

16  a home owner could not definitely remember seeing the placard but testified that she would interpret

17  the placard to mean the Mojave Defendants and Del Webb were working together.  (#64, Ex. 22,

18  Deposition of Rosalind Flans, 64:21–65:21).  Nevertheless, the language is such that it could be

19  literally true, but likely to mislead or confuse consumers.  In such case, Del Webb is required to

20  provide "proof that the advertising actually conveyed the implied message and thereby deceived a

21  significant portion of the recipients becomes critical." *William H. Morris Co.*, 66 F.3d at 258.  Aside

22  from Rosalind Flans's testimony, which is not very strong because she could not state that she

23  actually saw the placard, Del Webb has provided no proof that the message on the placard actually

24  deceived any homeowners.  Therefore, Del Webb has not created a genuine issue of material fact

25

that the Mojave Defendants falsely advertised an association with Del Webb in connection the placard.

Nevertheless, other homeowners have testified that the Mojave Defendants personally represented to them that Mojave was working with Del Webb.  One homeowner named Marilyn Hendrickson testified that when the Mojave Defendants or their representatives came out to her home to speak to her, they told her that they "were working with Del Webb," which she understood to mean that the Mojave Defendants were working in partnership with Del Webb to fix homes. (#64, Ex. 16, Deposition of Marilyn Hendrickson, 35: 3–14; 38: 8–19).  Another homeowner named Ellen Dreyer had the same misunderstanding of the relationship between Del Webb and Mojave from the Mojave Defendants representations.  (*Id*. at Ex. 18, Deposition of Ellen Dreyer, 14: 8–13, 16: 21–17:4; 28:21 – 29:12) ("And I kind of looked of Mojave as kind of the liason between the senior citizens live there and dealing with Del Webb so we wouldn't have to deal directly with them. And that was my understanding of what Mojave was doing with Del Webb").  The Mojave Defendants have not refuted this testimony.  As a result, Del Webb has established that the Mojave Defendants falsely represented an association or partnership with Del Webb.  Del Webb has also presented evidence that such representations were material, as homeowners would not have allowed the inspections if they had known that the Mojave Defendants were not licensed or not working with Del Webb.  (*Id*. at Ex. 17, 31:22–24; Ex. 14, 28:11–17; Ex. 12, 29:3–5; Ex. 15, 29:19–22).

The Mojave Defendants argue that the Lanham Act only renders actionable misrepresentations about *goods*, but that here the Mojave Defendants were advertising an *event* (*i.e.*, a home inspection).  This argument fails under the language of the Lanham Act itself, which states:

> Any person who, on or in connection *with any goods or services*, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the

origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added).

The Lanham Act expressly states that its makes false advertising actionable in connection with "any goods or services." The Mojave Defendants made false statements of fact in connection with services consisting of providing home inspection services. Therefore, the Mojave Defendants' false statements are actionable under the Lanham Act.

In conclusion, there is no genuine issue of material fact that the Mojave Defendants made false statements of fact.

## C. Interstate Commerce

Aside from the falsity of the Mojave Defendants' statements, the other major issue at dispute is whether the challenged false statements were made in interstate commerce. "The Lanham Act provides civil liability for any person who 'uses in commerce' any false or misleading description or representation of fact which in commercial advertising misrepresents the nature, characteristics, or qualities of any person's services or commercial activities." *Highmark, Inc. v. UPMC Health Plan, Inc*., 276 F.3d 160, 165 (3rd Cir. 2001); 15 U.S.C. § 1125(a)(1)(B). Congress's authority under the interstate commerce clause extends to purely intrastate activity if that activity substantially affects interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59 (1995); *Thompson Tank & Mfg. Co., Inc. v. Thompson*, 693 F.2d 991, 992-93 (9th Cir. 1982) (stating that the word "commerce" as used in the Lanham Act includes intrastate commerce which affects interstate commerce); *see also*, *Stauffer v. Exley*, 184 F.2d 962, 966 (9th Cir. 1950) ("[a]n infringement

1    committed in intrastate commerce but affecting interstate commerce could clearly be regulated by

2    Congress and thus would be within the present [Lanham] Act.").

3          The best evidence for Del Webb's case of interstate commerce is that the Mojave Defendants

4    created a website at <mcmclasvegas.com> to advertise their services.  (#55, Deposition of John

5    Wilson, Ex. 3, 233:3–236:3).  The website advertised that Del Webb had divisions in Phoenix,

6    Southern California, and Northern California, which allegedly were advertised as future divisions.

7    (*Id*.).  Although "[a]s both the means to engage in commerce and the method by which transactions

8    occur, 'the Internet is an instrumentality and channel of interstate commerce,'" Del Webb must still

9    prove that the false statements of fact were made in connection with the Mojave Defendants'

10   website.  *U.S. v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (quoting *United States v. Trotter*, 478

11   F.3d 918, 921 (8th Cir. 2007)).

12         With the current record, the Court cannot make that conclusion.  There is no evidence of the

13   content of the website.  The Court has no way of knowing what statements or misrepresentations,

14   if any, were made on that website.  According to Mr. Wilson, the Mojave Defendants never got any

15   business contacts from the website and have no way of tracking who accessed the website.  (#55,

16   Deposition of John Wilson, Ex. 3, 233:3– 236:3).  Del Webb has created an issue of fact because

17   it is clear that there was a website for the Mojave Defendants' business, and if the Mojave

18   Defendants were advertising that they were licensed to conduct home inspections (which they were

19   clearly doing for Nevada home inspections), in Arizona or California, then such statements would

20   constitute false statements of fact made in interstate commerce.  But there still remains a genuine

21   issue of material fact as what representations were made at the Mojave Defendants' website.

22         As to the fliers and placards distributed by the Mojave Defendants, there is no evidence that

23   these ever left the state or were even distributed outside of Del Webb's residential development.

24   Del Webb argues that because the Mojave Defendants depended on potential customers seeing the

25   fliers and placards and then calling the Mojave Defendants, this conduct constitutes interstate

1    commerce.  However, the only people who would have been calling the Mojave Defendants would

2    have been people in Nevada who saw the distributed fliers and placards.  Thus, Nevada consumers

3    would have been making calls within Nevada for an inspection of their Nevada home.  Del Webb

4    does not explain how such activity reaches interstate commerce.  Of course, even if entirely

5    intrastate, such activity could come under the Lanham Act if it substantially affects interstate

6    commerce.  Yet, this Court cannot find that home inspections of Nevada homes have a substantial

7    impact on interstate commerce.  Any impact would be purely intrastate.  Del Webb has not otherwise

8    provided evidence that consumers actually called from outside of Nevada to instigate a business

9    relationship with the Mojave Defendants.

10        In light of the foregoing, there remains a genuine issue of material fact whether the Mojave

11   Defendants made any false statements of fact in interstate commerce.

12        **D.    Damages**

13        In addition to establishing falsity (either by presumption or through direct proof customers

14   actually were deceived), a plaintiff must prove that he has been or is likely to be injured as a result

15   of the false statement, either by direct diversion of sales from itself to defendant or by a lessening

16   of the goodwill associated with its products.

17        In *Southland Sod Farms v. Stover Seed Co.*, the Ninth Circuit noted that it had previously

18   stated that "actual evidence of some injury resulting from the deception is an essential element" in

19   a suit for damages under § 43(a) but that in a subsequent decision, it had held that "an inability to

20   show actual damages does not alone preclude a recovery under section 1117."  108 F.3d 1134, 1146

21   (9th Cir. 1997).  Under the latter decision, "the preferred approach allows the district court in its

22   discretion to fashion relief, including monetary relief, based on the totality of the circumstances."

23   *Id*. (citing *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1411 (9th Cir. 1993)).  The Ninth Circuit

24   further noted that when "a § 43(a) claim involves false advertising rather than 'palming off,' courts

25   have been more willing to allow monetary damages even without a showing of actual consumer

1  confusion." *Id*. Therefore, the Ninth Circuit recognizes that legal damage, as opposed to actual

2  damage giving rise to an award of damages, is cognizable under the Lanham Act. *See Star-Kist*

3  *Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984) ("The lack of any actual damage

4  requirement renders irrelevant Rhodes's argument that Star-Kist can, at most, suffer only nominal

5  damages . . . Even if true, that claim ignores the fact that a party can still have a reasonable belief

6  that he will be legally damaged."). This result is different from what the Court can do under NRS

7  41.600, which indicates that the party seeking relief under NRS 41.600 must show actual damages

8  sustained.

9         Here, one could reasonably conclude, based on the evidence submitted by Del Webb, that

10 the Mojave Defendants' false advertisement claims were deliberately false within the meaning of

11 § 43(a), creating a presumption of actual consumer deception and reliance. The Mojave Defendants

12 have not rebutted that presumption. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th

13 Cir. 1986) ("He who has attempted to deceive should not complain when required to bear the burden

14 of rebutting a presumption that he succeeded."). Furthermore, Del Webb has produced deposition

15 testimony that certain homeowners did rely upon their misrepresentations that they were licensed

16 or working in conjunction with Del Webb to allow the Mojave Defendants to conduct the

17 inspections. As a result of allowing those inspections and initiating Chapter 40 claims against Del

18 Webb, Del Webb has shown that their customers put themselves in breach of their warranties with

19 Del Webb, precluding Del Webb from communicating with them and repairing their customer's

20 homes under the warranties. (#64, Ex. 22, 82:22–25; Ex. 23, 83: 8–24; Ex. 24, 47: 7–15; Ex. 25, 49:

21 2–5). Therefore, Del Webb has shown injury and carried its burden on summary judgment that it

22 was injured by the Mojave Defendants' Lanham Act violations.

23         Because proving actual damages in a false advertising case can be a challenge, the Lanham

24 Act permits a court, "subject to the principles of equity," to award damages based on the defendant's

25 profits on an unjust enrichment theory. 15 U.S.C. § 1117(a); *Lindy Pen Co., Inc.*, 982 F.2d at 1407.

Del Webb, however, has not spoken to the proper measure of damages.  Therefore, the Court holds that there is no genuine issue of material fact that the Mojave Defendants have injured Del Webb with their deceptive trade practices, but that Del Webb must still explain at trial the basis for an award of monetary relief.  Del Webb must also establish that the Mojave Defendants made false statements in interstate commerce.  In light of the foregoing, the Court must DENY both Del Webb's and the Mojave Defendants' summary judgment motions on the Lanham Act cause of action.

**V.     TORTIOUS INTERFERENCE WITH CONTRACT**

Del Webb argues that the Mojave Defendants intentionally disrupted their contractual relationship with Del Webb's homeowners.  In an action for intentional interference with contractual relations, a plaintiff must establish (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.  *Sutherland v. Gross*, 105 Nev. 192, 196, 772 P.2d 1287, 1290 (1989).  Only the Mojave Defendants have moved for summary judgment as to Del Webb's tortious interference with contract cause of action.

The Mojave Defendants contend that Del Webb cannot show that they intentionally disrupted Del Webb's warranties with Del Webb's buyers.  Del Webb is required to demonstrate that the Mojave Defendants knew of the warranties, "or at the very least, establish 'facts from which the existence of the contract can reasonably be inferred.'" *Id*. (quoting *Nat. Right to Life P.A. Com. v. Friends of Bryan*, 741 F.Supp. 807, 813 (D.Nev. 1990)).  Del Webb has pointed to several e-mails between the Mojave Defendants and the Angius & Terry law firm that confirm that the Mojave Defendants had knowledge of the Del Webb warranties.  (#64, Exs. 20, 21).

Regardless, "mere knowledge of the contract is insufficient to establish that the defendant intended or designed to disrupt the plaintiff's contractual relationship; instead, the plaintiff must demonstrate that the defendant intended to induce the other party to breach the contract with the plaintiff." *Id*. at 276.  Del Webb has created a genuine issue of material fact that the Mojave

Defendants intended to induce a breach of the warranty agreement between Del Webb and its homeowners. The Mojave Defendants were aware of the warranties, yet they were going door-to-door and suggesting or encouraging Del Webb's customers to use the Mojave Defendants' services to obtain an inspection so that the homeowners could then file a claim against Del Webb. Such conduct evinces an intent on the Mojave Defendants' part to induce the homeowners to breach their warranties with Del Webb.

One weakness in Del Webb's claim goes to damages. A plaintiff "who proves a claim of intentional interference with contractual relations is entitled to recover damages for the pecuniary loss of the benefits of the contract; damages for actual harm to reputation, if they are reasonably to be expected to result from the interference; and consequential losses for which the interference is a legal cause." *National Right To Life Political Action Committee v. Friends of Bryan*, 741 F.Supp. 807, 812 (D.Nev. 1990) (citing Restatement (Second) of Torts § 774A (1979)). Del Webb is not required to prove the resulting damages "to a mathematical certainty," but Del Webb "bears the burden of introducing sufficient facts to enable the Court to arrive at an intelligent estimate of damage without speculation or conjecture." *Id.* (citing *Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1456–57 (9th Cir. 1983)) and *Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir. 1982)). Such evidence could be presented in the form of a damages expert who could assist in the calculation of the total damages sustained by the tortious interference with Del Webb's warranties. *Frantz v. Johnson*, 116 Nev. 455, 469–70, 999 P.2d 351 (Nev. 2000). As to damages, Del Webb merely states, without any kind of evidentiary support, that "Del Webb is injured when its communications with homeowners are disrupted and it is forced to engage in litigation, losing its contractual right to resolve homeowner issues voluntarily, by mediation or arbitration" and "Del Webb suffers loss to its hard-earned reputation when faced with litigation, even class actions, fomented by illegal, unlicensed soliciations and inspections made by defendants." (#64, 23–24). This conclusory argument is insufficient to create a genuine issue of material fact that Del Webb

1    suffered damages as a result of the Mojave Defendants' alleged tortious interference with Del

2    Webb's contractual relationship with Del Webb's homeowners.  Thus, at trial, Del Webb will have

3    to prove the damages it incurred as a result of the Mojave Defendants' tortious interference.

4    Nevertheless, the Court DENIES the Mojave Defendants summary judgment motion as to the

5    tortious interference claim.

6    **VI.    ATTORNEYS' FEES**

7         Del Webb is seeking attorneys' fees under the Nevada Supreme Court's holding in *Sandy*

8    *Valley Assocs. v. Sky Ranch Estate Owners Ass'n*, 117 Nev. 948, 35 P.3d 964 (2001).  In that case,

9    the Nevada Supreme Court held that when a party claims it has incurred attorney fees as foreseeable

10   damages arising from tortious conduct or a breach of contract, such fees are considered special

11   damages and must be pleaded as such in the complaint.  *Id.* at 969, *receded from on different*

12   *grounds by Horgan v. Felton*, 170 P.3d 982 (Nev. 2007).  In *Sandy Valley Associates*, the court

13   pointed out that attorney fees are recoverable as "a cost of litigation" only under an agreement,

14   statute, or rule.  *Id*.  The Nevada Supreme Court has since recognized that the damages award rule

15   articulated in *Sandy Valley Associates* is a "narrow special damages exception" and that claimants

16   to that exception "generally have the arduous task of proving were a 'natural and proximate

17   consequence of the injurious conduct."  *Shuette v. Beazer Homes Holdings Corp*., 121 Nev. 837,

18   862–63, 124 P.3d 530 (Nev. 2005).

19        The Mojave Defendants have moved for summary judgment on this special damages claim.

20   Their argument minimally states that Del Webb does not have a cause of action because Del Webb

21   cannot prevail on any of its independent causes of action and therefore cannot seek attorneys' fees

22   as special damages as to any claims.  Because the Court is ruling that Del Webb either has or may

23   prevail at trial on its claims, the Court cannot grant summary judgment to the Mojave Defendants.

24   Del Webb may recover attorneys' fees for such conduct if Del Webb can carry its burden of showing

25

1  attorneys' fees related to those claims are a "natural and proximate consequence of the injurious

2  conduct" committed by the Mojave Defendants.

3        Therefore, the Court DENIES the Mojave Defendants' summary judgment motion as to

4  attorneys' fees.  Del Webb did not move for summary judgment on this issue.

5  **VII.  PERMANENT INJUNCTION**

6        Del Webb is seeking a permanent injunction of the Mojave Defendants' activities.  Del Webb

7  has presented evidence that the Mojave Defendants have not complied with the Court's preliminary

8  injunction against the Mojave Defendants and that they are still operating their home inspections

9  business.  Both Del Webb and the Mojave Defendants have separately moved for summary judgment

10  as to the permanent injunction.

11        To obtain a permanent injunction, a moving party must demonstrate "(1) that it has suffered

12  an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

13  to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and

14  defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

15  by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837,

16  164 L.Ed.2d 641 (2006).  The considerations with respect to a permanent injunction are substantially

17  similar to those applicable to a preliminary injunction, except that to obtain a permanent injunction,

18  the plaintiff actually must have succeeded on the merits.  *Sierra Club v. Penfold*, 857 F.2d 1307,

19  1318 (9th Cir. 1988).  Whether to grant or deny a request for a permanent injunction is within a

20  court's equitable discretion.  *eBay*, 547 U.S. at 391.

21        The Mojave Defendants argue that an injunction is prohibited and unconstitutional as a prior

22  restraint.  An injunction enjoining speech and expression is an example of a prior restraint on

23  speech.  *See Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979).  Nevertheless, "[n]ot all

24  injunctions that may incidentally affect expression . . . are prior restraints."  *Madsen v. Women's*

25

1   *Health Center, Inc.*, 512 U.S. 753, 763 n. 2, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (citations

2   omitted).

3        Commercial speech receives less protection under the first amendment than non-commercial

4   speech.  *U.S. v. Edge Broadcasting Co.*, 509 U.S. 418, 426 (1993).  To determine commercial

5   speech, the test is whether the speech "'propose[s] a commercial transaction.'"  *Bd. of Trustees of*

6   *State University of N.Y. v. Fox*, 492 U.S. 469 (1989) (citations omitted).  The speech at issue here

7   involves selling home inspection services.  The Mojave Defendants' goal in providing such services

8   was to be reimbursed, directly or indirectly, for their services from the home builders in whose

9   homes the Mojave Defendants detected structural defects.  As a result, the speech at issue here is

10  commercial speech.

11       Most importantly, the speech that would be enjoined by an injunction would be false or

12  deceptive commercial speech.  "The government may ban forms of communication more likely to

13  deceive the public than to inform it[.]"  *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,

14  447 U.S. 557, 563–64, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).  Where commercial speech is

15  deceptive, the speech is not entitled to protection under the First Amendment.  *See Am. Acad. of*

16  *Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir.2004) ("[T]he first inquiry is whether the

17  speech is unlawful or misleading. If it is either, then the commercial speech is not protected at all

18  by the First Amendment.").  The First Amendment offers no protection for false or deceptive

19  commercial speech.  The injunction would not prohibit the Mojave Defendants from engaging in

20  truthful commercial speech.   Nevertheless, at this stage, the Court will hold off on a permanent

21  injunction until the merits of all the claims have been adjudicated.

22       In light of the foregoing, the Court DENIES both parties' summary judgment motions related

23  to a permanent injunction.

24  . . .

25

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the Mojave Defendants' Motion for Partial Summary

3   Judgment is DENIED.  (#53).  IT IS FURTHER ORDERED that Del Webb's Motion for Partial

4   Summary Judgment is GRANTED as to the champerty claim but DENIED as to its other claims.

5   (#55).

6          DATED:          September 17, 2009

7

8          _____
           Robert C. Jones

9          United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25